# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

MARGARET L. WILSON,         )
                                     )
        Plaintiff,             )
                                     )
        v.                    )        CASE NO. 1:07-CV-60-TS
                                     )
KAUTEX, INC.,               )
                                     )
        Defendant.        )

## OPINION AND ORDER

Before the Court is *pro se* Plaintiff Margaret Wilson's Motion for Summary Judgment

[DE 143], filed on September 3, 2008, and Defendant Kautex's Motion for Summary Judgment

[DE 145], filed on September 4. Both motions are fully briefed and ripe for decision.

## BACKGROUND

This is a race and gender discrimination lawsuit that also includes a retaliation claim. The

Plaintiff received her right to sue letter from the EEOC on or about February 13, 2007. (Compl.

2.) (The EEOC letter is dated January 12, 2007. (*Id.* at 10.)) On May 21, she filed her Complaint

against the Defendant and several other corporate entities. The Complaint—which is on a

standardized form and includes a separate, typed document with her claims, factual allegations,

and requested relief—is based on Title VII, 42 U.S.C. § 2000e *et seq.* The Plaintiff claims that

she suffered discrimination "due to my race and gender as an African American female,"

(Compl. 4), while employed with the Defendant and when she was fired. She also asserts a

hostile work environment claim, and claims she suffered retaliation during her employment and

at termination. The Plaintiff seeks compensatory and punitive damages, attorneys' fees and costs,

and injunctive relief, specifically asking that her "[r]ecord [be] cleared to remove all negative slander placed against me and with the credit agencies." (*Id.* at 9.)

On May 20, the Defendants filed a Motion to Dismiss Certain Defendants [DE 21], asking the Court to dismiss all Defendants except the Plaintiff's former employer, Kautex, Inc. After the parties briefed the Motion, the Court on February 15, 2008, granted the Motion. (Opinion and Order, DE 105.) The parties have also filed motions for sanctions against each other. (*See* Motions, DE 132, 133.) The Court referred those motions to Magistrate Judge Roger B. Cosbey, who is holding the motions in abeyance while the Court decides the present summary judgment motions.

On September 3, 2008, the Plaintiff filed her Motion for Summary Judgment [DE 143]. The Plaintiff did not file a separate brief or memorandum in support, a statement of material facts, or separate designated evidence to support the statement of material facts.

The day after the Plaintiff filed her summary judgment Motion, September 4, the Defendant filed a Motion for Summary Judgment [DE 145], along with a Memorandum in Support [DE 146], a Statement of Undisputed Material Facts [DE 147-2], and supporting evidence [DE 147-3 to 147-9]. On October 2, the Plaintiff filed her Response [DE 149]. The Plaintiff did not file separately or within her Response a statement of genuine issues or any list of material facts as to which she contends there exists a genuine issue necessary to be litigated. She also did not file and designate any separate evidentiary or documentary material with her Response. However, she did file two lengthy exhibits [DE 149-2, 149-3]. On October 20, the Defendant filed its Reply in Support of Motion for Summary Judgment [DE 151].

On October 6, the Defendant filed its Response to the Plaintiff's Motion for Summary

Judgment [DE 150]. The Response incorporated by reference its Memorandum in Support [DE 146] of its own summary judgment motion. (*See* Def. Resp. 6, DE 150.) On October 20, the Plaintiff filed her Reply[1] [DE 152] in support of her summary judgment motion.

Because both the Plaintiff's and the Defendant's summary judgment motions address the same claims, the Court will consider them cross-motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The evidence the nonmovant relies on must be identified with reasonable particularity and must be

---

[1] The Plaintiff's Reply is entitled "Plaintiff Response to Defendant(s) Motion for Summary Judgment & Plaintiff Motion the Court to Make its Ruling," (Pl. Reply 1), but the docket correctly notes that it is the Plaintiff's Reply in support of her summary judgment motion.

"competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996); *see also Powers v. Dole*, 782 F.2d 689, 696 (7th Cir. 1986) (stating that when evidence is offered through exhibits on a summary judgment motion, those exhibits "must be identified by affidavit or otherwise admissible"). If appropriate, summary judgment should be entered against a party who fails to so respond. Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 322 (holding that a court should enter summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A material fact must be outcome determinative under the governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir. 2000). Although a bare contention that an issue of fact exists is not sufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997) (citing *Celotex*, 477 U.S. at 324.)

"The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313 (2d Cir.1981), quoted in *Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). "It is true that cross-motions for summary judgment do not waive the right to a trial, but this rule does not alter the respective burdens on cross-motions for summary judgment—more particularly here, the responsive burden of a plaintiff who moves for summary judgment and is confronted with a cross-motion for summary judgment. The motions are treated separately." *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008) (citations omitted). In other words, even if plaintiffs filed their own motion for summary judgment, that does "not relieve them of their burden as the nonmovants relative to the defendant's motion for summary judgment." *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 603 (7th Cir. 1989). In that situation, the plaintiffs are "required to set forth specific facts showing why summary judgment on behalf of the defendants was not appropriate." *Id.*

Finally, the Court is giving a "liberal construction to [the] pro se pleadings," *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008), and the Defendant has met its obligation to give a *Timms*[2] notice to the Plaintiff that it was going to file a motion for summary

---

[2] *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992).

judgment and to explain the Plaintiff's resulting responsibilities. (Def. Notice, DE 144.) Furthermore, in the Court's Order setting dispositive motion deadlines, the Court stated that the "parties are reminded to comply with Local Rule 56.1, which governs summary judgment procedure." (July 30, 2008, Order, DE 129.)

## MATERIAL FACTS

### A.  Procedural Issues Regarding Material Facts

Before recounting the material facts in this case, the Court must address some procedural aspects of the summary judgment process in this case. The Plaintiff's Motion for Summary Judgment [DE 143], which includes her brief in support of her Motion, is 29 pages, but the Local Rules for the Northern District of Indiana state that briefs can be no longer than 25 pages without the Court's permission, N.D. Ind. L.R. 7.1(d), which she did not seek or obtain. Her Motion combines her motion and memorandum in support, even though the local rules require that a motion for summary judgment "be accompanied by a *separate* supporting brief." N.D. Ind. L.R. 7.1(b) (emphasis added). The Motion and the included supporting brief do not include a table of contents, a statement of issues, or a table of cases, as required for briefs exceeding 25 pages. N.D. Ind. L.R. 7.1(d). The main text of the document does not appear to be double-spaced as required, and some of it is single-spaced. *Id.*

Much worse than these procedural deficiencies is the Plaintiff's failure to comply with Local Rule 56.1, which governs summary judgment procedure, both in her Motion for Summary Judgment [DE 143] and her Response to the Defendant's Motion for Summary Judgment [DE 149]. Local Rule 56.1 requires that a movant include in the summary judgment brief or

append to it "a 'Statement of Material Facts,' supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence, as to which the moving party contends there is no genuine issue." N.D. Ind. L.R. 56.1(a). The rule requires the opposing party to include in or append to its response "a 'Statement of Genuine Issues' setting forth, with appropriate citations to . . . admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." *Id.* The opposing party must also "file any affidavits or other documentary material controverting the movant's position." *Id.*

As noted above, the Plaintiff failed to include a statement of material facts within or appended to her brief in support of her summary judgment motion. Instead, the Plaintiff's brief (which is part of the Motion) is a narrative of incidents that the Plaintiff believes support her claims of racial and gender discrimination, hostile work environment, and retaliation. She supplements this narrative with citations to legal authorities and to documents she asserts are part of the record, but these citations to the record do not comply with Local Rule 56.1(a). The Plaintiff did not file any designated evidence (such as her own sworn affidavit) along with her summary judgment motion. Instead, the citations to evidentiary material apparently reference documents filed earlier in this case, but none of these citations includes docket entry numbers or particular page references that would enable the Court to locate them.

The Plaintiff's Response to the Defendant's Motion for Summary Judgment [DE 149] suffers from similar problems. Along with her Response, the Plaintiff filed two exhibits [DE 149-2 and DE 149-3], the first running 57 pages and the second 84 pages. These exhibits appear to compile documents from the case. However, the Plaintiff has not provided a table of contents to guide the Court through these two voluminous filings. Deposition excerpts, emails,

payroll documents, company memoranda, and other documents run together with no explanation or in no particular order, and there is no discernable labeling system for these exhibits. For example, page 28 of the second exhibit appears to be the Plaintiff's business card while she was employed by the Defendant. A sticker labels it "Plaintiff Exibit [*sic*] 17." (DE 149-3 at 28.) The next page is an email to the Plaintiff from the Defendant's human resources manager, Russ Fatum. This is labeled as "Plaintiff's Exhibit V." (*Id.* at 29.) The next page, an expense report filled out by the Plaintiff, is labeled as "Plaintiff Exhibit 24." (*Id.* at 30.) Page 7 of the first attachment, which appears to be an email from Fatum to the Plaintiff, is labeled "Exhibit OO." Some exhibits have no exhibit labels at all. For example, the first five pages of the second attachment [DE 149-3] appear to be an excerpt of the Plaintiff's deposition, but there is no label designating it as a specific exhibit at all. The Plaintiff's haphazard use of numbers, letters, and roman numerals and the absence of labels on other exhibits leaves the Court at a loss as to how the Plaintiff organized her evidentiary material. "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions." *Waldridge, v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

Furthermore, the Response itself is mostly a series of objections to the Defendant's Statement of Undisputed Material Facts [DE 147-2] and to the affidavits of the Defendant's employees. Almost all of these objections are insufficient denials because they lack any citation, or an acceptable method of citation, to sworn affidavits or other competent evidence that would be admissible at trial. "The district court cannot be expected to search through the entire record for evidence that may support a party's contentions; a party must point to specific evidence that

creates a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e)(2) (requiring an adverse party to 'set out specific facts')." *Compania Administradora de Recuperativos de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l. Inc.*, 533 F.3d 555, 562 (7th Cir. 2008). Where these objections do refer to evidentiary materials, the citations suffer from the problems explained immediately above: there is no discernable way to locate the cited evidence within the Plaintiff's two large attachments. Also, many of her objections and assertions do not actually controvert the Defendant's statements of facts.

These problems with the Plaintiff's summary judgment submissions raise the issue of whether, or how, the Court can, for purposes of the Plaintiff's Motion, "assume that the facts as claimed *and supported by admissible evidence* by the moving party are admitted to exist without controversy." 56.1(b) (emphasis added). Even without considering the Defendant's Statement of Undisputed Material Facts and the supporting evidentiary material, the Court cannot accept the facts as asserted by the Plaintiff in her Motion for Summary Judgment [DE 143] because almost without exception[3] she failed to support these asserted facts with admissible evidence in accordance with the local rules. In addition, the Defendant controverted the Plaintiff's asserted (but unsupported) facts in its Response in Opposition to the Plaintiff's Motion for Summary Judgment [DE 150], which incorporated the Defendant's Statement of Undisputed Facts [DE 147-2], along with supporting material, as its "Statement of Genuine Issues." Therefore, with certain exceptions explained below, the Court accepts the facts as asserted by the Defendant and deems them admitted for both the Defendant's and the Plaintiff's motions for summary judgment.

---

[3] The Court will address those few instances where the Plaintiff has supplied and clearly identified evidentiary material that supports particular asserted facts.

9

The Court's decision in that regard has support in Seventh Circuit precedent, even for *pro se* litigants. Referring to rules such as this District's Local Rule 56.1, the Seventh Circuit has

> endorsed the exacting obligation these rules impose on a party contesting summary judgment to highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute, explaining that district courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions.

*Waldridge*, 24 F.3d at 921–22. The Seventh Circuit has "repeatedly upheld the *strict* enforcement of these rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts." *Id.* at 922 (emphasis added).

This standard, like all procedural rules, *McNeil v. United States*, 508 U.S. 106, 113 (1993), applies to *pro se* cases. *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). "The essence of liberal construction is to give a *pro se* plaintiff a break when, although he stumbles on a technicality, his pleading is otherwise understandable. However, a lawsuit is not a game of hunt the peanut." *Id.* (citation and internal quotations omitted). "Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* (internal quotations omitted). *See also Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) (stating that district courts "are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."). As a consequence, "a district court is entitled to decide the motion based on the factual record outlined in the [Local Rule 56.1] statements." *Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1110 (7th Cir. 2004) (internal quotations omitted); *see also Markham v White*, 172 F.3d 486, 490 (7th Cir. 1999) (upholding

district court's decision to disregard citations to evidentiary material that did not comply with the local rule).

**B.      The Plaintiff's Hiring, Supervisor, and Duties**

Kautex manufactures and distributes component parts for the automobile industry. It has a production facility in Avilla, Indiana. Russ Fatum was the human resources business partner at the facility from 2003 to 2006, and Eldon Fuller was the vice president of operations from 2003 to 2006. Because of Fatum's increased business travel, they decided to hire a person to handle the administrative duties of Fatum's position. Fatum placed a classified advertisement in local newspapers seeking a person for the administrative position.

The Plaintiff, who is female and African American, applied for the job and was interviewed by Fatum and Fuller. On March 31, 2005, Fatum offered the Plaintiff the job. She signed the offer on April 1 and began work on April 6. Her employment was terminated on December 6, 2005.

The Plaintiff reported directly to Fuller, but she received some supervision from Fatum, who "had authority to delegate assignments to Wilson." (Fatum Aff. ¶ 6, DE 147-4; Fuller Aff. ¶ 5, DE 147-3.) The Plaintiff disputes that Fatum had supervisory authority over her and she cites the Defendant's response to the EEOC[4], which states: "Kautex Textron hired Ms[.]

_____

[4] This document happens to be the first page of the first exhibit [DE 149-2] to the Plaintiff's Response to Defendant's Motion for Summary Judgment [DE 149]. The Plaintiff asserts that this document is the Defendant's response to the EEOC, which the Defendant does not dispute. (*See* Def. Reply 6, DE 151). However, nothing in the three pages of this document authenticates this as the Defendant's response to the EEOC. There is no logo or heading, and there is no separate sworn affidavit attesting that the document is the Defendant's response to the EEOC. This document would be inadmissible, but the Court nevertheless considered it because it shows the Plaintiff's objection is not inconsistent with the Defendant's statements and it exemplifies the problematic way in which the Plaintiff presented her summary judgment motion and supporting evidentiary materials.

Margaret Wilson as an Administrative Assistant on April 6, 2005 to work directly for Mr. Fuller, Vice President Operations. . . . Ms[.] Wilson was hired to work directly for Greg Fuller, Vice President Operations. At no time during her employment did Mr. Russ Fatum supervise or direct Ms[]. Wilson." (Pl. Resp., Ex. 1, DE 149-2 at 1.)

As the Defendant correctly points out, this statement is not inconsistent with the Defendant's summary judgment materials. Fatum stated in his affidavit: "Because Wilson was going to be assuming many of the duties I performed for Fuller, I was primarily responsible for training her. Fuller was Wilson's direct supervisor; however, I also had authority to delegate assignments to Wilson." (Fatum Aff. ¶ 6.) Fatum's authority to delegate assignments to the Plaintiff is not inconsistent with Fatum not supervising or directing her. Supervising and directing denote day-to-day and task-oriented management. Delegation is different; it means "to entrust or transfer (as power, authority, or responsibility) to another." Merriam-Webster's Dictionary of Law (1996). In any event, the Plaintiff does not explain how this distinction is material to any of her legal claims.

Her job duties included, but were not limited to, providing administrative support to Fuller; ordering supplies for the plant and the office through a computer system; keeping an inventory of supplies and distributing them throughout the plant and the office; and working on projects to enhance employee morale. (Fatum Aff. ¶ 5.)

## C.      Incidents Early in the Plaintiff's Employment, Racial Comments

### 1.      *Cleaning "Bob's Closet"*

One of the first incidents at issue involves "Bob's Closet," a supply closet near the

Plaintiff's office. The Plaintiff asked Fatum what to do about the supplies and files in the closet. Fatum suggested she organize and clean the closet because "maintaining the supply closet was going to be one of Wilson's primary duties." (Fatum Aff. ¶ 7.)

The Plaintiff in her deposition complained about Fatum's email instructing her to clean the closet and suggested it used racial slurs. (Def. Mot. for Summ. J., Ex. 5, Wilson Dep. 56:2–6, DE 147-6 at 2). "Q. Okay. Tell me when – what racial slurs were used against you while you were at Kautex? A. When Russ Fatum sent me an e-mail about wanting me to clean a janitor's closet that they had named Bob." (*Id.*) However, the Plaintiff a few moments later admitted that Fatum and others at Kautex never used racial slurs or racially charged language toward her.[5] (*Id.* at 56:24–58:5.) The Plaintiff testified: "No one was overtly verbally telling me and calling me names. It was in – I would say it was covertly." (*Id.* at 57:23–25.) Even though she admitted that no one called her any racial slurs or made racial comments, she stated that "the way I felt" was that she was suffering discrimination. (*Id.* at 68:16.) She also testified that she believed she was fired so quickly after she was hired because "it's been very prevalent of hiring [*sic*] to fire African-Americans, especially in the state of Indiana. Hire them and then make it look like they're not working out and then fire them." (*Id.* at 91:3–7.)

## 2.     *Trip to Off-Site Facility*

Another incident involved a trip to an off-site meeting during the Plaintiff's first week of

---

[5] This is the relevant exchange in the deposition:
Q. Okay. But just so we're clear, the whole time you worked at Kautex, nobody called you racial names or said things directly to you that you thought were somehow connected to your race, correct?
A. No.
(Def. Mot. for Summ. J., Ex. 5, Wilson Dep.  at 56:24–58:5, DE 147-6 at 3.)

employment. Fatum asked the Plaintiff to ride in a car with another employee to a meeting outside the facility  because the other employee knew how to reach the location and because the Plaintiff was not familiar with it or how to get there. (Fatum Aff. ¶ 8, DE 147-4 at 2.). The Plaintiff testified that she was not comfortable riding with the other employee for a variety of reasons (he was from a different department, she preferred to drive herself or with a female employee, and he was "a total stranger,") but she never stated her discomfort was due to race or gender issues. (Wilson Dep. 60–61, DE 147-6 at 3.) As a result, she drove to the meeting by herself. (*Id.*)

**D.    Problems with Computer Systems**

The Plaintiff's access to an automated credit card payment and reimbursement system called Captura was another issue during her employment. Like all new employees, the Plaintiff was instructed to submit expense reports in paper form for reimbursement. (Hollman Aff. ¶¶ 4–5, DE 147-5 at 1–2.) In May 2005, the Plaintiff traveled to two Kautex facilities and complained to others about her lack of access to the automated system. (Wilson Dep. 70–74, DE 147-6 at 5–6.) Bryan Hollman, Kautex's controller, in September 2005 delayed the Plaintiff's access to Captura "because she had made several mistakes in the manual expense reporting system and because she demonstrated a lack of skill and ability in managing Kautex'[s] automated purchase and procurement system, Ariba." (Hollman Aff. ¶ 5, DE 147-5 at 2.)

The Plaintiff also experienced problems with the Ariba system, which was used to order supplies for the Avilla plant. Hollman testified: "Wilson failed to use Ariba properly. . . . I arranged for Wilson to receive additional training with Ariba and tried to help her understand the

system and use it effectively, however, Wilson never mastered the system and frequently failed to submit supply orders correctly." (*Id.* ¶ 7.) Fatum testified that "Wilson routinely failed to make the weekly paper order." (Fatum Aff. ¶ 9.) The Plaintiff tried to shift to Hollman her duties relating to supply ordering by telling employees to submit requests to him. (Hollman Aff. ¶ 8.) The Plaintiff also made and attempted to make purchases through Ariba from unauthorized vendors. (*Id.* ¶ 9.)

Hollman testified that these problems resulted in "supply shortages at the plant." (*Id.* ¶ 8.) Fuller concurred: "Because Wilson continually failed to enter the required information to complete Ariba orders, there were several instances when the plant did not have the necessary supplies to operate." (Fuller Aff. ¶ 6.) As an example, Fuller cited an email from a senior engineer about a paper shortage. (Fuller Aff., Ex. A, June 2, 2005, Darryl Engel-Fuller email, DE 147-3 at 10.) Fatum testified that "[o]n more than one occasion, the plant did not have paper for the copy machines and I drove to Staples and purchased paper." (Fatum Aff. ¶ 9.)

The Plaintiff on at least one occasion told Hollman that she would not order supplies from several vendors. (Hollman Aff. ¶ 8 (citing Hollman Aff., Ex. G, Wilson-Hollman Nov. 10 & 11, 2005, emails, DE 147-5 at 19–20)). The Plaintiff also wrote an email to Hollman stating: "Since you are enjoying every order that I place. [*sic*] It is clear that you intend on making my job as difficult as possible. I DO NOT learn by you taking pleasure in making my job difficult." (Hollman Aff., Ex. C, June 27, 2005, Wilson-Hollman email, DE 147-3 at 17.) Fuller responded by telling the Plaintiff to stop complaining about Ariba and to seek help in learning how to use the system. (*Id.*, Fuller-Wilson email, DE 147-3 at 14–15.)

**E. Relating to Other Employees, Job Performance, and Other Incidents**

**1. *Relating to Other Employees and Supervisors***

In addition to informing Hollman that she would not order supplies from certain vendors, the Plaintiff "refused to carry out assignment[s] [that] I delegated to her. (Fatum Aff. ¶ 12.) The Plaintiff "told me she would not perform tasks I asked her to complete." (*Id.*) Fatum cited two emails in support of this contention. In one, the Plaintiff said arranging food for training "is becoming confusing, it would be better if Sherry handled your request in the future [*sic*] please leave me out unless Greg Fuller tells me to assist." (Fatum Aff., Ex. D, November 17, 2005, Wilson-Fatum email, DE 147-4 at 20.) In another email to Fatum, she wrote: "I'm new I need to be able to trust the information being given to me by management. To avoid further conflicts, in the future, unless Greg Fuller tells me what I need to do. [*sic*] I would appreciate it if you go through Greg my boss before asking me to act upon your instructions because it truly has in the past and currently is causing problems for me." (Fatum Aff., Ex. C, July 29, 2005, Wilson-Fatum email, DE 147-4 at 18.)

In June, Fatum became concerned about the Plaintiff's "difficulties in getting along with her co-workers." (Fatum Aff. ¶ 11.) Fatum stated in his affidavit that several employees complained to him about "Wilson's demeanor and communication style. I received several complaints that Wilson was rude, disrespectful, and uncooperative." (*Id.* at ¶ 10.) "Employees also complained that Wilson sent caustic e-mail messages. On more than one occasion, Wilson sent e-mails addressed or copied to me that were unnecessarily confrontational." (*Id.*)

Fuller had the same experience. "Wilson did not get along with the other employees at the Avilla, Indiana plant. I received several complaints from other staff members that Wilson

was rude, disrespectful, and sent attack style e-mail messages." (Fuller Aff. ¶ 8.) In June and August, Fuller "spoke with Wilson about her conduct and told her that she needed to be less abrasive and be more respectful of other people." (Fuller Aff. ¶10.) Fuller stated that the Plaintiff "told me she felt people did not like her. . . . Wilson never told me she felt she was disliked or treated differently because she was African American or a woman." (Fuller Aff. ¶¶ 10, 11.)

### 2.      *Job Performance Issues*

Not long after the Plaintiff started working, her supervisors noticed that she was having trouble meeting the requirements of her job. Fatum testified: "During the middle to end of June 2005, I noticed that Wilson was not performing her job in a satisfactory manner. Supplies were not being ordered . . . ." (Fatum Aff. ¶ 11.) Fatum asked Fuller to meet with the Plaintiff about her job performance, and "[a]fter their meeting, Fuller asked me to provide Wilson with additional guidance regarding how to perform her job." (*Id.*) Fatum emailed the Plaintiff with suggestions and encouragement about performing her job, including who to contact for help and training. (Fatum Aff., Ex. B, June 27, 2005, Fatum-Wilson email, DE 147-4 at 14–15.)

### 3.      *Other Incidents*

Other incidents that became a point of contention involved a cellular telephone, damage to the Plaintiff's car, attending and taking minutes at weekly meetings, and unauthorized awards. The Plaintiff suggested that she was initially denied a cellular telephone[6] for work. (Pl. Mot. for Summ. J. 8.) After the Plaintiff submitted an expense report for a cellular telephone bill, Fuller

---

[6] The Plaintiff also complained that, after she was fired, she was charged for using the phone. (Pl. Mot. for Summ. J. 8.) The Court will address post-termination issues later in this Opinion.

told Hollman that he did not believe that the Plaintiff required a cell phone for her duties. (Fuller Aff. ¶ 13 (citing Fuller Aff., Ex. E, Aug. 2, 2005, Fuller-Hollman email, DE 147-3 at 25–26.)) Hollman responded by noting that other employees did not request a company cellular phone and did not seek reimbursement for work calls, and that approving a phone or reimbursement for the Plaintiff would mean other employees "may have a right to have the same level of service." (Fuller Aff., Ex. E, Aug. 2, 2005, Hollman-Fuller email, DE 147-3 at 26.)

The Plaintiff's vehicle was damaged at the Avilla facility when she drove over "a protruding parking post" in the Kautex parking lot on July 12, 2005. (Hollman Aff. ¶ 10.) Her vehicle was repaired the next day at a cost of $608.63. (*Id.*) Hollman provided the Plaintiff with a reimbursement check for that amount a few weeks later, on July 29. (*Id.*). The Plaintiff testified that she believed someone tampered with her car, but she did not know who had done so. (Wilson Dep. 122–25, DE 147-6 at 9.)

The Plaintiff was also upset about weekly management meetings. The Plaintiff indicated she "felt uncomfortable when I would attend all the meeting with guys and . . . I just felt that I was not being treated fair about the work." (Wilson Dept. 68:6–9, DE 147-6 at 4.) But the Plaintiff also indicated that when Fatum told her that she no longer needed to attend the meetings, she viewed that as retaliation for complaining about alleged discrimination during her trips to Michigan and Canada. (*Id.* at 69:1–8.) The Plaintiff also was concerned that she was responsible for taking the minutes of the meetings, but "was not allowed to be a part of [the meetings] in order to do my job. And how was I going to do it when I wasn't even allowed to attend the meetings?" (*Id.* at 67:25–68:3.)

Fuller testified that he initially asked the Plaintiff to attend the meetings and take

minutes, but "I eventually decided that minutes of the meetings were not necessary and informed Wilson [that] she no longer needed to attend the meetings." (Fuller Aff. ¶ 7.) "Wilson did not receive any discipline or negative performance comments regarding my request that she not attend the meetings." (*Id.*)

On August 19, Fatum discovered that the Plaintiff, without authorization, had given to contract cleaning workers recognition awards in the form of certificates for hotel rooms. (Fatum Aff. ¶ 15.) Fatum and Fuller met with the Plaintiff and ordered her to give out recognition awards only if Fuller authorized them. (*Id.*; Fuller Aff. ¶ 14.) When the supervisors looked into this incident, they learned that the Plaintiff had also given an unauthorized award to a contract, temporary employee. "During the investigation it was found that at the same time Margaret also gave Paul a certificate for a contract temp employee." (Fatum Aff., Ex. F, Aug. 19, 2005, Fatum Memo to the File, DE 147-4 at 24.)

## F.     The Plaintiff's Complaints to Employees at Other Kautex Facilities

The Plaintiff testified that, while on a trip to Kautex facilities in Michigan and/or Canada, she complained about racial discrimination and disparate treatment to Sarah Broschay, a human resources official, and that she communicated with Broschay several more times about complaints. (Wilson Dep. 66:7–11, 66:23–67:15.) The Plaintiff testified that she did not file a written complaint about discrimination at that time. (*Id.* at 66:18–20.) The Plaintiff testified that she complained that "I felt that I was being treated differently than the white employees as regards to the tools that I needed to do my job." (*Id.* at 67: 18–20.)

Fatum and Fuller were not aware of any conversation between the Plaintiff and Sarah

Broschay. (Fatum Aff. ¶ 28; Fuller Aff. ¶ 23.) Both testified that Broschay never talked to them about the Plaintiff and that the Plaintiff never told them that she had spoken with Broschay. (*Id.*)

## G.    The Plaintiff's Statements About Comments Regarding her Gender

The Plaintiff testified that Hollman made a remark she considered to be derogatory about her gender: "Mr. Hollman came by, and he looked at me and said coffee, tea, or me. I consider that to be a very sexist remark. And it was reported to Mr. Fuller who laughed, also. And nothing was done about it." (Wilson Dep. 58:16–19.)  She added that Hollman "laughed and smirked as he was walking by when he said it to me," (*id.* at 58:25–59:1), but he did not touch the Plaintiff at that time, (*id.* at 58:20–22). Hollman did not deny or otherwise address this incident in his affidavit. Fuller said Wilson never told him she was treated unfairly because of her race or gender. (Fuller Aff. ¶ 11.)

## H.    Incidents in November and December

A number of incidents and disputes involving the Plaintiff occurred at the end of November and into early December.

### 1.    *Conference Room Disputes*

In early November, Fatum and Fuller received complaints about the Plaintiff from Keytoria King, a Kautex employee from another facility, regarding her request that the Plaintiff reserve one or more conference rooms. (Fatum Aff. ¶ 16; Fuller ¶ 9.) King complained about the Plaintiff's emails, which Fuller characterized in his affidavit as "rude and accusatory." (Fuller

Aff. ¶ 9.) After King's complaint, Fatum spoke with Fuller "about Wilson's mistreatment of King." (Fatum Aff. ¶ 16.)

In a series of emails to King, the Plaintiff wrote: "My experience in professionally dealing with you is that you lack professional etiquette when making your request to me which is unacceptable. I do not report to you but only to Greg Fuller." (Fuller Aff., Ex. D, Nov. 10, 2005, Wilson-King email, DE 147-3 at 20.) After King forwarded that email and others written by the Plaintiff to Fuller, Fuller wrote, "I do not agree with the statement. Your professionalism should not have been brought into play. Keep up the good work." (Fuller Aff., Ex. D, Nov. 14, 2005 Fuller-King email, DE 147-3 at 19.) A few days later, another dispute occurred between the Plaintiff and Sheryl Ritchie, a member of the Spirit Team, a group of employees who organize activities for employee morale, when the Plaintiff refused Ritchie's request to use a specific conference room. (Fatum Aff. ¶ 17.)

### 2.    *The Plaintiff's Purchase of a DVD Player*

The Plaintiff's compliance with her supervisors' orders became an issue when she purchased a DVD player. The Plaintiff asked Fatum about buying one in late November 2005, and Fatum told her not to buy it. (Fatum ¶ 15.) On November 26, the Plaintiff brought to the plant a DVD player that she had purchased. (*Id.* ¶ 19.)

### 3.    *Dispute Concerning the Christmas Party*

The 2005 Christmas party prompted another dispute. "Like all other Kautex employees, Wilson was invited and allowed to attend the Christmas party and bring one adult guest." (Fatum

Aff. ¶ 20.) It is not clear if the Plaintiff knew about this limit. She paid the party organizer—Sheryl Ritchie of the "Spirit Team"—$30 for herself and two guests. When the Plaintiff later learned that she could only bring one guest, she requested and received a refund of the $30. After the Plaintiff sent an email to Ritchie, Ritchie forwarded the message to Fatum and wrote: "Please advise why every issue with Margaret has to be so negative. She assumes that each instance is a personal attack. I will refund her money and remove her from the list as per her request." (Fatum Aff., Ex. I, Nov. 29, 2005, Ritchie-Fatum email, DE 147-4 at 33.) Fatum responded: "Understood, I forwarded it to Greg as he is working with her on her approach and communication skills. Sorry." (Fatum Aff., Ex. I, Nov. 29, 2005, Fatum-Ritchie email, DE 147-4 at 33.)

At a meeting with Ritchie and Fatum in Fatum's office about the party, the Plaintiff "spoke in a confrontational tone of voice to Ritchie, complaining that she was allowed to bring only one guest to the employee Christmas party. Wilson's conduct was inappropriate.." (Fatum Aff. ¶ 19.) Fatum reported the incident to Fuller, and they later met with the Plaintiff "about her job performance and demeanor. Fatum and I informed Wilson that her conduct and job performance [were] unacceptable," (Fuller Aff. ¶ 16), citing her "inflammatory e-mails to other employees," "poor attitude," "poor treatment of other employees," "demonstrated lack of respect of other employees," and "supply ordering problems," (*id.*). Fuller "reminded Wilson that the meeting was the third time I had talked to her about her conduct. . . . I told Wilson that her conduct and performance had to improve or we would ask her to leave Kautex." (*Id.*)

After the meeting, Fatum drafted a memorandum to the file concerning the incident and the meeting. The memorandum recounted the four issues raised with the Plaintiff, the amount of

time Fatum spent dealing with complaints about the Plaintiff and her work, and the number of meetings or conversations with the Plaintiff about her performance and demeanor. (Fatum Aff., Ex. J., Nov. 29, 2005, Fatum Memo, DE 147-4 at 34–35.) The memorandum also noted that the Plaintiff "disagreed and said that she was professional and that most of the employees do not like her. . . . [S]he tried to explain that she believes all employees are trying to manipulate her. . . . Margaret mentions that she likes her job but cannot deal with the people." (*Id.*) It also noted that "Margaret said that she would not talk to anyone or email anyone. I told her that would make matters worse . . . ." (*Id.*) The memorandum further reported that "[a]fter an hour of discussion, Margaret was still not accepting the feedback." (*Id.*) Fatum and Fuller then warned the Plaintiff that, if her performance and relations with other employees did not improve in the next few days, then Fuller "would have to take the matter in his own hands," (*id.*), and "he would be left no choice to take action," (*id.*) referring to termination.

### 4. *Incidents on December 2*

On December 2, a human resources employee told Fatum that an hourly employee had complained that the Plaintiff refused to allow him to get a cup of coffee from the front office. (Fatum Aff. ¶ 23.) "It was standard practice at the Avilla, Indiana plant that hourly employees were permitted to get coffee from the office, at no charge." (Fuller Aff. ¶ 18.)

On the same day, Ritchie informed Fatum that several movie passes were missing from the Spirit Team awards. (Fatum Aff. ¶ 22.) Fatum investigated and discovered that the Plaintiff had given the passes to a contract employee named John Swihart, who confirmed to Fatum that he received the passes from the Plaintiff. (*Id.*) "Swihart said when Wilson gave him the

envelope, she put her finger to her lips and said, 'Shh, don't tell anyone.'" (*Id.*) Swihart followed up with an email on December 5 providing the same account. (*Id.* (citing Fatum Aff., Ex. K, Dec. 5, 2005, Swihart-Fatum email, DE 147-4 at 36.)) Fuller told Fatum that he had not authorized the Plaintiff to give the movie passes to Swihart. (Fuller Aff. ¶ 17.) Fatum prepared a memorandum noting that he had told the Plaintiff in July that she should not have given $350 worth of certificates to contract employees, and that only he or Fuller could authorize such gifts. (Fatum Aff. ¶ 22; Fatum Aff., Ex. L, Dec. 2, 20005, Fatum Memo, DE 147-4 at 37.)

Also on December 2, Fuller learned that the Plaintiff had worked unauthorized overtime the previous weekend, even though he and Fatum both told the Plaintiff in August that she needed to obtain Fuller's permission before working overtime. (Fuller Aff. ¶¶ 12, 19; Fatum Aff. ¶ 13.)

## I.    Termination

After learning of these recent incidents, Fuller "discussed the status of her job with Fatum. After speaking with Fatum, I decided to terminate Wilson's employment." (Fuller Aff. ¶ 20.) Fatum, Fuller, and Sherry Martz, the human resources coordinator, met with the Plaintiff on December 5 and asked her if she had worked overtime the previous weekend. (Fatum Aff. ¶ 24; Fuller Aff. ¶ 19.) The Plaintiff admitted that she had done so. (Fatum Aff. ¶ 14. Fuller ¶ 21.) She further "acknowledged that she knew she was not suppose[d] to work overtime without my permission." (Fuller Aff. ¶ 21.) The Plaintiff "also admitted that she had bought a DVD player and delivered it to the plant the previous Saturday," (Fuller Aff. ¶ 21; *see also* Fatum Aff. ¶ 24), even though Fuller had "instructed her not to purchase the DVD player."

(Fatum Aff. ¶ 24.) The Plaintiff denied giving awards to employees without Fuller's permission, but when Fuller asked about Swihart, "she admitted she had." (Fuller Aff. ¶ 21; *see also* Fatum Aff. ¶ 24.)

Fuller reminded the Plaintiff that they had recently met to discuss her performance, and he told her that he felt he "could not trust her and her employment was terminated." (Fuller Aff. ¶ 21; *see also* Fatum Aff. ¶ 24.) The Plaintiff asked for a second chance, and Fuller said he would consider it overnight. ( Fuller Aff. ¶ 21.) At the end of the meeting, Martz took the Plaintiff's company credit card, keys, phone, and access card. (Fatum Aff. ¶ 24.)

The next day, December 6, Fuller and Fatum discussed the matter and decided to terminate the Plaintiff's employment because she had issued the awards without permission, purchased the DVD player after being told not to, worked unauthorized overtime, and exhibited "disrespectful demeanor [that] negatively affected employee morale." (Fuller Aff. ¶ 22; *see also* Fatum Aff. ¶ 25–26.) Fuller stated that "[o]ur decision to terminate Wilson's employment had nothing to do with her race or gender." (Fuller Aff. ¶ 22.) Fuller called the Plaintiff that day and informed her of the decision. On December 7, Fatum sent the Plaintiff a letter confirming her termination "due to her violation of company rules and poor demeanor." (Fatum Aff. ¶ 27.) The letter states: "The basis of the termination is the result of your violation of company rules relating to payroll practices (unauthorized overtime), unauthorized purchases, unauthorized issuance of company property (recognition awards)[,] and your general poor demeanor effecting [*sic*] the morale of employees coming in contact with you." (Fatum Aff., Ex. N, Dec. 7, 2005, Fatum Termination Letter, DE 147-4 at 39.)

**J.**     ***Other Relevant Facts, Post-Termination Events, the Plaintiff's Statements***

The Plaintiff in her summary judgment filings compared her situation to that of two other employees, Kyle Morgan and James Barton. Morgan was "a Focus Factor Manager. Morgan's job involved managing production" at the plant. (Fatum Aff. ¶ 29.) Barton was "an Operations Manager. Barton's job involved supervising the production and maintenance operations at " the plant. (*Id.* ¶ 30.)

The Plaintiff completed an Indiana Department of Workforce Development unemployment insurance information request form. (Wilson Dep., Ex., DE 147-6 at 11.) She wrote that she was terminated "due to economics" and "due to cutbacks." (*Id.*) The Plaintiff also testified that she believes she was fired because Kautex was "cutting back." (*Id.* at 79:6, DE 147-6 at 7.)

## ANALYSIS

The Plaintiff's four Title VII claims against the Defendant are hostile work environment, racial discrimination, gender discrimination, and retaliation.

**A.**     **Hostile Work Environment**

In a summary judgment proceeding for a Title VII hostile work environment claim, a plaintiff must establish that (1) the plaintiff was the object of unwelcome harassment; (2) the harassment was based on gender and/or race; (3) the harassment was sufficiently severe and/or pervasive so as to alter the conditions of employment; and (4) there is a basis for employer liability. *Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008). Also, in order to be actionable

under Title VII, a hostile work environment must be both objectively and subjectively offensive, "such that a reasonable person would find the environment hostile or abusive, and . . . that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). As for the third element, the Seventh Circuit has ruled that the harassment may be "severe *or* pervasive." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004) (emphasis in original). Accordingly, "even one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

In determining whether a work environment is hostile or abusive, a court will consider the totality of the circumstances and the following factors: "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Faragher*, 524 U.S. at 787–88. However, "Title VII does not mandate admirable behavior from employers." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001) (brackets, citation, and internal quotations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher* 524 U.S. at 788. "[R]elatively isolated instances of non-severe misconduct" will not support a hostile environment claim. *North v. Madison Area Ass'n for Retarded Citizens*, 844 F.2d 401, 409 (7th Cir. 1988). On the other hand, a hostile work environment can result from "the cumulative effect of . . . events, and that effect forms a 'single unlawful employment practice.'" *Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

The Plaintiff acknowledged in her deposition that she was never subject to slurs or

comments about her race or gender except for Hollman's "coffee, tea, or me" comment. Instead, she interprets a number of events, incidents, and disputes as racially- and gender-motivated harassment. The Court will examine these in turn.

1.  ***Bob's Closet***

The first incident that the Plaintiff complains about is Fatum's request or order that she clean out a supply closet known as "Bob's Closet." She characterizes this as racial (but not gender) harassment. The Plaintiff claims that Fatum gave this assignment "in front of other white employees; who laughed and patted Fatum on his back which publicly humiliated Plaintiff." (Pl. Resp. 5, DE 149.) She testified in her deposition that other employees laughed at her while she was cleaning the closet. She claims that another employee, Sherry Martz, other white administrative assistants, and the company's cleaning service, never had to clean the closet. (Pl. Mot. 6; Pl. Resp. 3.) She states that "Fatum was deliberately attacking Plaintiff in hopes that she would resign or that she would be insubordinate so she would be terminated." (Pl. Resp. 6.) "Plaintiff was setup [*sic*] when she accepted the position which was why she was greatly discriminated in her job and given unrealistic task[s] to perform." (*Id.*)

The Plaintiff has not supported her claims about and interpretation of this event with any designation of evidence that complies with the local district rules or come forward with admissible evidence to show that there are specific facts creating a genuine issue for trial. There is no evidence (such as an affidavit of a white employee) to support her claim that white employees laughed when Fatum allegedly assigned the task to the Plaintiff in front of other persons. Fatum's affidavit, which is the only admissible evidence about the incident in the

record, does not indicate that he assigned this task to the Plaintiff in front of other employees.

Also, the Plaintiff has failed to provide any support, such as affidavits from employees with

personal knowledge about who was required to clean or maintain closets, for her claim that no

other white assistants had ever cleaned that particular closet or similar closets. She has also

provided nothing to controvert Fatum's statement in his affidavit that "[m]aintaining the supply

closet was going to be one of Wilson's primary duties." (Fatum Aff. ¶ 7).

The three pages of the Plaintiff's Motion for Summary Judgment [DE 143 at 5–8] that

address this issue do not cite to supporting sworn affidavits. At only one location in that part of

her Motion does she cite to evidentiary material, and that is to the Defendant's job description

for her position and Fatum's email to her instructing her to clean the closet. (Pl. Mot. for Summ.

J. 6, DE 143.) She calls the job description "Exhibit's [*sic*] 1" and the email "Exhibit 2," but as

explained earlier, her summary judgment motion includes no exhibits. After those citations, the

Plaintiff suggests that theses were "[a]lready submitted with the U.S. District Court when

Plaintiff filed on July 30, 2007; Page 9, of Plaintiff Response to Defendant(s) Interrogatories

Exhibit 'O.'" (Pl. Mot. for Summ. J. 6, DE 143.) This citation to previous docket entries does not

comply with Local District Rule 56.1, and this Court will not search through the many docket

entries in this case to find what the Plaintiff is referring to because "district courts are not

obliged in our adversary system to scour the record looking for factual disputes." *Waldridge*, 24

F.3d at 921–22; *see also Greer*, 267 F.3d at 727 (noting the same principle applies to *pro se*

litigants in employee discrimination cases).

The Plaintiff's Response to the Defendant's Summary Judgment Motion [DE 149] suffers

from the same deficiency. It purports to quote an email from Fatum to the Plaintiff in which

Fatum instructed the Plaintiff to clean out the closet. (Pl. Resp. to Def. Summ. J. Mot. 5.) There is no citation next to the email indicating where the email itself can be found in the two accompanying "exhibits." At the end of the section discussing the closet, there is only one citation, and that is to "Exhibit 'OO' of July 30, 2007 Plaintiff Production of Documents to Defendants." (Pl. Resp. to Def. Summ. J. Mot. 6.) It is not clear whether this is a citation to Fatum's email or something else. In addition to being unclear, this citation to a separate, earlier docket entry in the case fails to comply with Local District Rule. The only entry from the Plaintiff on July 30, 2007, is docket entry 47, which has a different name: "Plaintiff Response to Defendant(s), Kautex, A Textron Company, Parent(s), and Subsideries [*sic*] Interrogatories to Plaintiff, Margaret L. Wilson." (DE 47 at 1.) This document is 36 pages long and it has three exhibits which are 66, 46, and 54 pages long, respectively. A review of all of these pages failed to locate "Exhibit 'OO.'"

Even if the Court were to consider the material the Plaintiff provided in support of her claim regarding the order to clean the supply closet, it would not support her view that the duty constituted was racial harassment. Fatum's email[7], which the Plaintiff calls "a malicious and insulting correspondence," (Pl. Mot. for Summ. J. 6, DE 143), happens to be on page seven of

---

[7] The email from Fatum to the Plaintiff assigning her the task of cleaning out "Bob's Closet" was dated April 8, 2005, and the subject line stated: "Cleaning Bob's Closet." (DE 149-2 at 7.) The text of the email is as follows:

Margaret,

I have a most interesting assignment for you to perform as your first duty here at Kautex. I'd like for you to fully clean "Bob's closet." It's an area of all sort of items and materials that have been stored for years. The closet has never been cleaned so dress casual because it's very dirty and junky.

This will represent a most challenging project for you but based upon your experience and education, I'm certain that you're up for the job!!! Dispose of all dishes and silverware items because we now use catering services. The task might take a week or so to complete so if you need additional help come see me.

Thanks

Russ

(*Id.*)

30

the first exhibit to the Plaintiff's Response. First, the email itself indicates that Fatum

communicated this instruction to the Plaintiff directly and privately, rather than in front of a

group of other employees, as the Plaintiff had claimed. Second, nothing about the email (such as

racially charged language or slurs) suggests that it is discriminatory, racially harassing, or creates

a hostile work environment. A March 31, 2005, memorandum[8] from Fatum to the Plaintiff

explained her duties in more detail. (DE 149-2 at 4–6.) It states that the Plaintiff will perform the

following duties: "Oversee administrative procedures and processes for the assigned work area. .

. . Organize office operations such as workspace assignment and layout." (*Id.* at 4.) It ends by

noting that "[a]dditional responsibilities will be added as you become more familiar within your

daily work routine." (*Id.* at 6.) These duties are not inconsistent with cleaning and organizing

Bob's Closet.

 In conclusion, based upon the evidentiary materials properly before the Court, the

assignment to clean the closet was not objectively unwelcome harassment and was not based on

the Plaintiff's race, contrary to her assertions. The Plaintiff's claims lack evidentiary support

because she did not comply with the local district rules and because even the evidence she did

cite (Fatum's email and her job description) does not support any claim of racial harassment.


**2.** ***Trip to Off-Site Meeting***

 The Plaintiff claims that "Fatum sexually harassed Wilson" by telling her to ride with

another employee to a meeting outside the facility. (Pl. Resp. 7.) She apparently believed that

this other employee had engaged in one or more extramarital affairs with other employees, that

---

[8] This memorandum happens to be the second document of the first exhibit [DE 149-2] to the Plaintiff's
[DE 149].

Fatum knew of this, and that Fatum was acting "as a pimp." (*Id.*) The Plaintiff asserts that she "did not desire to lower her standards as a professional to engage in dissipated acts of immorality to be prostituted by Fatum." (*Id.* at 6.) The Plaintiff says she was uncomfortable with riding with the other employee, and that she insisted on driving by herself, which she eventually did.

The Plaintiff's claims here are without evidentiary support. Her only citation is to "Dep. 59, 61 & 62." (*Id.*) That citation does not enable the Court to locate those deposition pages in the Plaintiff's summary judgment materials, and the Court does not have to scour the record to find factual support for the Plaintiff's claims. The Defendant, however, did provide the Plaintiff's deposition in an exhibit to its own summary judgment motion, (DE 147-6), but the deposition does not support her suggestions that she believed Fatum was "pimping" or that the other employee was on the prowl for a sexual encounter during the car ride. The Plaintiff simply testified that she was "uncomfortable going in a car with somebody that I just met." (Wilson Dep. 61:2–3, DE 147-6 at 2.) She testified that she wanted to drive by herself or with another female "because I felt very uncomfortable in going with a total stranger of a manager in a different department." (*Id.*) Even if Fatum knew the Plaintiff's preference about not riding with strangers of the opposite sex before he asked her to ride with the other employee, that does not rise to the level of creating a hostile work environment. "It is not enough that a supervisor . . . fails to treat a female employee with sensitivity, tact, and delicacy." *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999). Title VII "is not a general civility code," *Berry v. Delta Airlines, Inc.*, 260 F. 3d 803, 808 (7th Cir. 2001) (internal quotations omitted), and it "does not guarantee a utopian workplace, or even a pleasant one." *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994).

Just as importantly, nothing else in the deposition excerpts or anywhere else in the record supports the claim that Fatum's intent was to sexually harass the Plaintiff. For example, no affidavits from other current or former employees state or suggest that Fatum directed the Plaintiff and others to ride with this employee for the purpose of sexual harassment. The Plaintiff's unfounded suggestions are insufficient. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and discrimination law would be unmanageable if disgruntled employees . . . ."). The only admissible evidence in the record about this event is Fatum's affidavit, in which he stated that his reason for suggesting that the Plaintiff ride with the other employee was that she was still in her first week of employment and did not know the location of the meeting or how to get there, but the other employee did. As it turns out, the Plaintiff did not follow Fatum's suggestion to ride with the other employee and instead drove by herself without any negative repercussions from Fatum. The Court concludes that this was not an incident of gender-related harassment, was not objectively offensive, and thus it did not contribute to any hostile work environment.

**3.**        ***Problems with Computer Systems***

The Plaintiff claims that her problems with the Captura and Ariba systems were due to racial harassment and not to her own difficulties using the system, as the Defendant claims. She further alleges that she was denied access to the Captura system because she was African-American, and that other white assistants who worked for the Defendant or related corporate entities had access to the system. (Pl. Resp. 14–15.) In her Motion for Summary Judgment, the

Plaintiff does not designate evidence in support of this claim, and her Response is an unsupported and insufficient denial.

Her Motion cites to credit card records, an email, and an "Exhibit 'S' already submitted to the U.S. District Court." (Pl. Mot. 9.) These citations do not indicate where in the summary judgment materials the Court can find this evidence, and the Court is not obligated to scour the record for the evidence. In any event, it is not clear how this evidence would support her claim. To start with, because access to a computer system does not have a facially racial element or overtone, she would need evidence demonstrating that similarly situated white administrative assistants had access to the system, but she only makes bare assertions. This is not acceptable at the summary judgment stage, "when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotations omitted). Her Response, which objects to the Defendant's statement that she had problems with Captura, also is deficient. The few citations do not indicate how to find the evidentiary material. *See* Fed. R. Civ. P. 56(e)(2) (stating that a party opposing a properly made and supported motion "may not rely on allegations or denials").

queue

The Plaintiff also claims that her problems with the Ariba system were due to Hollman, who she claims "wanted to harass Wilson because she was African American and he was supporting Fuller and Fatum in either creating a method to terminate her employment or forcing Plaintiff to resign." (Pl. Resp. 13.) She claims that she "did not encounter problems ordering office and plant supplies," and that she did not have problems with her expense reports. (*Id.*) She then attempts to attack the Defendant's evidence, arguing that "[n]one of the emails copied or

addressed to Wilson from Hollman, Fatum, or Fuller suggest otherwise. Management omitting Wilson from being included within emails demonstrates conspiracy. Of them not reporting the truth. [*sic*]" (*Id.*)

These claims lack evidentiary support. The few citations she provides do not indicate where in the record the evidence can be found, and her claims are mere denials of the sworn affidavit testimony (along with evidentiary materials, such as emails) provided by the Defendant. As such, they do not support her claim that she was the victim of racial harassment based upon a lack of access to the Ariba system. *See* Fed. R. Civ. P. 56(e)(2). Furthermore, it is not clear exactly which emails the Plaintiff is referring to in, but the emails attached as exhibits to the affidavits of Fuller, Fatum, and Hollman do indeed indicate that the Plaintiff had problems with the computer systems. Also, it is irrelevant whether "management" copied the Plaintiff on emails about her problems with the computer systems. The emails speak for themselves.

In the end, the Plaintiff views her difficulties with the computer systems as the result of racial harassment, and the evidence properly before the Court demonstrates that her computer difficulties were an employee performance problem. The Plaintiff has not provided any admissible evidentiary support and does not claim to have affidavits from similarly situated white employees. On the other hand, the Defendant has provided affidavit testimony and evidence (emails) to support its position. Accordingly, the Court concludes that denying the Plaintiff access to the computer systems was not related to her race or gender and was not harassment, so it did not contribute to any hostile work environment.

**4.** *The Plaintiff's Cellular Telephone*

The Plaintiff claims that she was entitled to a company-issued cellular telephone and disputes who was responsible for paying the bill. Construing this complaint liberally, it seems that she is alleging that some managers believed she should not have a cell phone and that the Defendant arranged for her to be charged $420.40, which she characterizes as retaliation. The Court will address the retaliation issue in Part C., *infra*.

From the evidence before the Court, it does not appear that the Plaintiff was ever authorized to have a company cell phone, as she claims. Fuller's affidavit states that he did not believe the Plaintiff needed a cell phone for her duties. In emails attached to that affidavit, Fatum tells Fuller that he "did not have a conversation with her regarding a cell phone." (Fuller Aff., Ex. E., Aug. 2, 2005, Fatum-Fuller email, DE 147-3 at 25.) Fuller goes on to write: "I suggest that we pay it instead of getting in an email war of words and tell her to get rid of the phone." (*Id.*)

The Plaintiff makes no claim that anyone used racially- or gender-related language when discussing the cell phone or that similarly situated white administrative assistants had cell phones. In fact, the Defendant's evidence indicates that many other employees did not have cell phones, and one reason for not giving one to the Plaintiff was that other employees "may have a right to have the same level of service." (Fuller Aff., Ex. E, Aug. 2, 2005, Hollman-Fuller email, DE 147-3 at 26.) The Plaintiff cites to an email and a payment history, (Pl. Mot. for Summ. J. 8), but these citations do not refer to evidence submitted with her summary judgement materials, which the rules require. N.D. Ind. L.R. 56.1; *Waldridge*, 24 F.3d at 922.

The Court did locate some cell phone related documents (billing records, service

agreement, expense reports, etc.) in the Plaintiff's first attachment to her Response. (*See* DE 147-2 at 34–43.) Even if the Court were to consider this improperly submitted evidence, Fed. R. Civ. P. 56(e)(2), N.D. Ind. L.R. 56.1, it does not show that she was authorized to have a cell phone for company use or that the Defendant's decisions about the cell phone were related to racial or sexual harassment. No evidentiary materials, such as affidavits from individuals with personal knowledge, state that white administrative assistants were given cell phones or that the Plaintiff needed one for her job.

Based on the evidence before the Court, the Court concludes that the Defendant's decision not to issue the Plaintiff a company cell phone was not based on her race or gender, and did not contribute to an unlawful hostile work environment.

5.      ***Damage to Plaintiff's Car***

The Plaintiff's car suffered damage as she was leaving the company parking lot on July 12, 2005. She states that when she put the car in reverse, the "car jolted and the entire front bumper came off the car." (Pl. Mot. for Summ. J. 15.) The Plaintiff claims that metal stakes in the cement parking block were sticking up into her car's bumper, and that they had not been like that when she left her car. The Plaintiff claims that one or more persons at the Kautex facility tampered with her car and that Fatum and others laughed at her during the incident. She further alleges that she was denied the use of a company car while her car was being repaired, that was reimbursed only after she paid for the repairs herself, and that others, mainly Hollman, made derogatory comments to her about the incident.

The Plaintiff's summary judgment filings do not cite to any evidence, such as affidavits

of witnesses, that would support her claims that someone working at Kautex tampered with her car. The Plaintiff even admitted in her deposition that she has "no knowledge" of the identity of the person who allegedly tampered with her car, and that her car had not been moved. (Def. Mot. for Summ. J., Ex. 5, Wilson Dep. 123:16–20, 124:2–5, DE 147-6 at 9.) Her theory that someone must have tampered with it after she parked is not sufficient. because at summary judgment "[i]nferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions." *Rand*, 42 F.3d at 1147. She cites to some unspecified document, (*see* Pl. Mot. 16), that she believes supports her claim that other employees were reimbursed more quickly than she was, but the citation refers to an earlier filing in the case, not summary judgment materials, so it is unacceptable. *Compania,* 533 F.3d at 562. The Plaintiff asserts that Hollman made hostile comments to her about this incident—"maybe this was a message that she didn't need to work for Kautex anymore and worsea [*sic*] things could happen," (Pl. Mot. 16), and "perhaps Kautex[] isn't the place for you," (*id.* at 17)—but she lacks lack evidentiary support even in the form of the Plaintiff's own sworn affidavit. *See Powers v. Dole*, 782 F.2d 689, 696 (7th Cir. 1986) (stating that when evidence is offered through exhibits on a summary judgment motion, those exhibits "must be identified by affidavit or otherwise admissible"). Also, even if the Plaintiff did have evidence that Hollman made these remarks, these "relatively isolated instances of non-severe misconduct" will not support a hostile environment claim. *North v. Madison Area Ass'n for Retarded Citizens*, 844 F.2d 401, 409 (7th Cir. 1988).

  The admissible evidence before the Court shows that the Defendant reimbursed the Plaintiff the entire $608.63 repair cost a few weeks after the incident, on July 29. (Hollman Aff. ¶ 10.)  Based on the evidence of the Defendant's reimbursement and the Plaintiff's lack of

evidence supporting the claims of tampering, derogatory comments, and slow reimbursement, the Court concludes that this was not an incident of racial or gender harassment and that it did not contribute to any hostile work environment.

6.      *Attending and Taking Minutes of the Weekly Meetings*

The Plaintiff asserts that weekly management meetings were occasions of racial and gender discrimination, and that a supervisor's comment that she need not attend the meetings was a form of retaliation. The Court will address the retaliation issue in Part C, *supra*. The Plaintiff has stated that she "felt uncomfortable attending Fuller's weekly managers['] meetings . . . because Fuller refused to value and respect Plaintiff as an African American female and did not encourage his all white male direct reports to do the same." (Pl. Resp. 19.) The Plaintiff states that she was not allowed to sit at the table with the managers but instead ordered to sit in the back of the room and take notes. She also alleges that "Fuller used profanity and inappropriate jokes that should never have taken place in a professional corporate meetings in Plaintiff's presence." (*Id.*) The Plaintiff provided neither details about the alleged profanity and jokes nor specific facts suggesting racial or gender harassment.

There are several problems with this claim. First, she fails to provide evidentiary support for her claims. Her only citation is "Dep. 66-69 already entered," (Pl. Resp. 19), but this does not point the way for the Court to find the deposition excerpt in the Plaintiff's summary judgment filings. *Compania*, 533 F.3d at 562 ("The district court cannot be expected to search through the entire record for evidence that may support a party's contentions; a party must point to specific evidence that creates a genuine issue of material fact for trial.").

Second, the deposition itself, which the Defendant appended to its Motion for Summary Judgment, does not to support a hostile work environment claim. The Plaintiff in her deposition stated that she felt she could not do her job of taking the minutes when she was not allowed to attend the meetings, and that she "felt that this had to do with my color." (Wilson Dep. 67:22–68:4.) The Plaintiff then described her feelings about the meeting as follows: "I always felt uncomfortable when I would attend all the meetings with guys . . . I just felt that I was not being treated fair about the work." (*Id.* at 68:6–9.) However, the Plaintiff did not report any discriminatory comments or overt acts: "Q. But nobody said anything to you, right? A. No one said anything to me, but then at the same time – A. But it's – that was  – it was simply the way you[] felt fair enough? A. That was the way I felt." (*Id.* at 68:11–15.) She gave an example of walking into the room when "they would be laughing and joking upon me entering that room. Then when I enter the room, everybody stops and kind of gives me the brush off as if what is she doing here?" (*Id.* at 21–24.)

The Plaintiff's feelings about these meetings, as reflected in the deposition, are not sufficient evidence that she suffered a hostile work environment in this situation. *Rand*, 42 F.3d at 1147 ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors."). Even assuming (which the Court does not have to do because the Plaintiff provides no evidence in support of this assertion) that managers at these meetings were rude, abrupt, or impolite, that does not establish an objectively hostile work environment. *See McKenzie v. Milwaukee County*, 381 F.3d 619, 625 (7th Cir. 2004) (stating that a supervisor acting standoffish, unfriendly, and unapproachable toward the plaintiff did not establish an objectively hostile work environment); *Minor*, 174 F.3d at 858 ("It is not enough that a

supervisor . . . fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor."). This is because "Title VII is not a general code of workplace civility, nor does it mandate admirable behavior from employers." *McKenzie*, 381 F.3d at 624 (internal quotations omitted). Moreover, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005).

Third, her discrimination and retaliation theories stemming from these meetings are at odds. She claims that she suffered discrimination and was uncomfortable when attending these meetings, but after she was told she did not have to attend them, she viewed that as retaliatory exclusion.

7. ***Not Going to Lunch with Coworkers***

In her Motion for Summary Judgment, the Plaintiff claims that she was excluded from and never invited to lunch with other employees because of her race. She alleges one specific incident in May 2005. She states that when she observed approximately seven white employees preparing to leave for lunch, she told Fatum (one of those employees) that she would like to be included, and that "Fatum replied, 'You might want to go to lunch with us . . . (under his breath) but you won't,' as he and the rest of the group left the building." (Pl. Mot. for Sum. J. 9–10.)

The Plaintiff cites to and provides no evidence, such as her own or witness affidavits, in support of this allegation, so her claim fails. *See Springer*, 518 F.3d at 484 ("[S]ummary judgment is the . . . moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."). Additionally, being excluded

once from lunch with an all-white group (if that indeed occurred) does not rise to the level of harassment in a hostile work environment claim. *See Mannie v. Potter*, 394 F.3d 977, 982–83 (7th Cir. 2005) (reiterating that isolated incidents that are not particularly severe are not sufficient to sustain a hostile work environment claim).

**8.** *The Christmas Party Incident*

The Plaintiff claims that Fuller and Fatum told her that she could not bring guests to the 2005 Christmas party even though other employees were bringing guests. The Court construes this as a claim of racial harassment contributing to an allegedly hostile work environment. The Plaintiff once again in her Motion fails to cite to any admissible evidence in support of her claim about this situation and to bring forward any evidence indicating racial or sexual harassment other than an implied allegation that she could not bring guests because she is African American.

More importantly, the admissible evidence put forward by the Defendant shows a very different situation. The affidavits of Fatum and Fuller and emails from Sheryl Ritchie, an employee involved in organizing the party, show that all employees were allowed to bring one guest to the party, but the Plaintiff had signed up (and paid $30, $10 per person) to bring two guests to the party. When the Plaintiff learned of this policy, she demanded a return of her money and wrote the following message: "It's your responsibility to inform us of the number of guests . . . . Now that management has informed me that I cannot invite 2 guests and at this late date. [*sic*] Please remove my name from the Christmas party list and refund my deposit money today." (Fatum Aff., Ex. I, Nov. 29, 2005, Wilson-Ritchie email, DE 147-4 at 33.) Later on November 29, the Plaintiff and Ritchie met in Fatum's office, and during this meeting "Wilson

spoke in a confrontational tone of voice to Ritchie, complaining that she was allowed to bring only one guest to the employee Christmas party. Wilson's conduct was inappropriate and I asked Ritchie to leave the office. Like all other Kautex employees, Wilson was invited and allowed to attend the Christmas party and bring one adult guest." (Fatum Aff. ¶¶ 19–20.) After Ritchie left, Fuller joined Fatum and the Plaintiff and they discussed the Plaintiff's job performance and demeanor for more than an hour. (*Id.* ¶ 21.) They told the Plaintiff that her performance and demeanor would have to improve or her employment would be terminated. (*Id.*) Fatum relayed that "Wilson said that she did not know how to handle the other employees' personalities." (*Id.*) This evidence-supported account makes clear that the Plaintiff was allowed to bring one guest like all other employees and that this incident was not racial or gender harassment.

The Plaintiff's Response also lacks proper citations to any designated evidence to support the Plaintiff's assertions. The Plaintiff denies that the meeting with Ritchie and Fatum occurred, but she "may not rely merely on allegations or denials" in the face of the Defendant's evidence. Fed. R. Civ. P. 56(e)(2). She also claims Ritchie would have copied the Plaintiff on Ritchie's email about the incident "because Ritchie would not have had anything to hide. This email is purely conspiracy." (Pl. Resp. 21.) This assertion is speculative and does not overcome the evidence put forward by the Defendant. *Rand*, 42 F.3d at 1147. The Plaintiff cites to what she calls "exhibit 5" and "exhibit 4," (Pl. Resp. 21–22), but those refer to earlier filings in the case and were not included in the Plaintiff's summary judgment materials. As a result, they will not be considered. *Waldridge*, 24 F.3d 922. Also, assuming the exhibits are what the Plaintiff says they are (the Christmas party sign-up sheet and some vacation form), they would not show that other employees were allowed to bring multiple guests while the Plaintiff could not, or that such

a decision was racial or gender harassment. As a result, the evidence before the Court establishes that the Christmas party was not an incident of unlawful harassment and did not contribute to any hostile work environment.

**9.** ***Workplace Clothing Issues***

The Plaintiff also claims that Fuller told her to wear blue jeans and fitted tops like two other administrative assistants instead of "suits and professional clothing." (Pl. Mot. for Sum. J. 12.) The alleged directive occurred after two white, female administrative assistants complained that the Plaintiff's professional attire and "uppity" behavior "made them feel bad" because they wore casual clothes. (*Id.* at 11–12.) According to the Plaintiff, those assistants "wore very tight fitted blue jeans and sexy tops to work." (*Id.* at 12) The Plaintiff claims that Fuller's instructions were "offensive and controlling because he wanted Plaintiff to dress unprofessional which was an unwelcome request." (*Id.*) As a result, she bought "some non-fitted blue jeans from Goodwill and some regular dress blouses but refused to get the sexy tops that" the other assistants wore. (*Id.*) The Plaintiff claims that Fuller "continued to harass and bully Plaintiff for weeks because Wilson's dress wear was not to his satisfaction." (*Id.*) The Plaintiff states that Fuller had two purposes for giving the instruction to wear different clothes—to remedy ill feelings of other employees and "to degrade Wilson's standard of work ethics" because Fuller knew that the Plaintiff "was a Christian and didn't smoke, drink, and had a set of values when he hired Wilson." (Pl. Resp. 25.) The Plaintiff states that about three weeks after this situation arose, the two other assistants "started to wear dresses and pant suits to work . . . . Fuller told Plaintiff that now, she 'Wilson' could stop wearing blue jeans and start back to dressing professional [*sic*]

'after'" the two assistants "decided to change their attire." (Pl. Mot. 12.)

The Plaintiff cites no evidence to support her claims regarding this situation. She does not offer a sworn affidavit relating what Fuller allegedly told her or any witness testimony to that effect. The evidentiary materials submitted by the Defendant do not address the underlying facts of this allegation, so there is no factual record for the Court to analyze. *Springer*, 518 F.3d at 484 ("[S]ummary judgment is the . . . moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."); *Compania* , 533 F.3d 562 ("The district court cannot be expected to search through the entire record for evidence that may support a party's contentions; a party must point to specific evidence that creates a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e)(2)").

Even if the Court were to take the Plaintiff's claims at face value, another problem is that the Plaintiff provides no evidentiary support for the claim that Fuller told her to change her attire in order to degrade her. The first reason suggested by the Plaintiff for Fuller's instruction is a neutral, legitimate workplace reason, and the Plaintiff's own Motion states that Fuller told her she could wear professional clothes again because the other two assistants changed the way they were dressing. If Fuller's instructions were based on the Plaintiff's gender, the change in attire of the other two assistants would not have mattered. The second reason suggested by the Plaintiff for Fuller's directive is not related to the Plaintiff's gender, but rather her religion, which was not a claim or issue raised in the Complaint. The Plaintiff "must show the link" between offensive behavior and her sex. *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs.,*

*Inc.*, 523 U.S. 75, 80 (1998)). Given what the Plaintiff states as the reasons for Fuller's instructions about workplace clothing, the Plaintiff has not shown this link.

Additionally, even if Fuller's directive is considered to be harassment based on the Plaintiff's gender, it cannot be considered either severe or pervasive enough so as to alter the conditions of employment because the directive cannot objectively be considered "extreme." *Minor*, 174 F.3d at 858 ("It is not enough that a supervisor . . . fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.") The Seventh Circuit came to the same conclusion in *Hilt-Dyson v. City of Chicago*, 282 F.3d 456 (7th Cir. 2002), where the plaintiff was ordered to raise her arms during a uniform inspection, the supervisor stared at her chest, and he inspected her hat and revolver closely. The court said it was "a close call" whether that behavior was "an effort to demean her on account of her sex," but it did not matter because the inspection, even combined with other conduct (such as back rubbing), did not rise to the required level of severity or pervasiveness. *Id.* at 464.

**10.** ***"Coffee, Tea, or Me?" Remark***

In August 2005, the Plaintiff was serving coffee to persons attending a business meeting at the Kautex facility and claims that Hollman:

> closely followed Plaintiff out of the meeting toward the beverage area and said to Wilson (while he was laughing) "coffee, tea, or me." Hollman's remarks embarrassed Wilson. Wilson told Hollman that he would not talk[] to [her] in that manner because it's sexiest [*sic*] and to apologize. Hollman continued laughing and walked off.

(Pl. Mot. for Summ. J. 13.) The Plaintiff states that she reported this to Fuller, that Fuller told her to "lighten up" and "learn how to be less formal," and that Hollman is "immature." (*Id.*) She

alleged that "[n]o investigation was conducted and no action was ever taken," (*id.*), and that when she told Fuller "of her right to address the Commission for Employment Equity," Fuller told her "that she would be fired." (*Id.*)

The Plaintiff does not provide any evidence in support of her claims about this incident, but the Defendant does not deny it either. If the remark was made, it would be a derogatory phrase of an inappropriate sexual nature.[9] The question is whether a jury (assuming there is admissible evidence that this comment was made) could view this one sexually suggestive remark by a coworker (not a direct supervisor) as creating a hostile work environment. The answer is "no" because it is not sufficiently severe or pervasive.

"One utterance alone does not create an objectively hostile work environment." *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004). In *McKenzie*, the plaintiff pointed to one offensive comment—far more offensive than the one here, "George thinks women are only good for f---ing"—but the Seventh Circuit ruled that "this isolated comment is insufficient to establish severe or pervasive harassment." 381 F.3d at 625. In *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002), the court noted that several offensive comments—including a statement to a female nurse that "the only valuable thing to a woman is that she has breasts and a vagina"—did not rise to the level of severe or pervasive harassment. In *Adusumilli v City of Chicago*, 164 F.3d 353 (7th Cir. 1998), the plaintiff endured far more harassment than the one sexually suggestive comment in this case: "teasing about waving at squad cars, ambiguous

_____

[9] The origin of the phrase apparently is the 1967 book of the same name ("Coffee, Tea or Me? The Uninhibited Memoirs of Two Airline Stewardesses"), which was ghost-written by Donald Bain, *see* Aileen Jacobson, *Whodunit? Had to Be the Ghostwriter Murder, He and She Wrote*, Newsday, Sept. 20, 1989, 1989 WLNR 201225, "recounted the supposedly true risque adventures of the [two airline] stewardesses," Brian Koonz, *Sometimes a Word Is Worth a Thousand Pictures*, The News-Times (Danbury, Conn.), Nov. 7, 2008, 2008 WLNR 23421443, and was made into a 1973 movie.

comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks." *Id.* at 361. Yet the Seventh Circuit said "the most salient feature of the harassment is its lack of severity." *Id.* Also, the *Faragher* factors for discerning whether a hostile work environment exists indicate that this remark, if it was made, did not contribute to or establish a hostile work environment. The remark was allegedly made once rather than frequently; it was not severe; it was not physically threatening, and there is no allegation that the comment interfered with the Plaintiff's work performance. *See Faragher*, 524 U.S. at 787–88. These cases and others, along with the *Faragher* factors, require the Court to conclude that the single sexually suggestive remark, if it was made, is not severe or pervasive enough to have created a hostile work environment.

Because the Court has concluded that none of the other incidents identified by the Plaintiff amounted to harassment based on race or gender, there can be no "cumulative effect of . . . events . . . that . . . . form[] a single unlawful employment practice." *Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008) (internal quotations omitted). As a result, the Defendant is entitled to summary judgment as there is no genuine issue of material fact regarding the Plaintiff's hostile work environment claim. Also, the Plaintiff has fallen far short of the hurdle she faces with her own Motion for Summary Judgment. That Motion requires her to show that she is entitled to judgment as a matter of law, not just that there is a genuine issue of material fact for trial. *See McKinney*, 548 F.3d at 505 n.4 (stating that, because the plaintiff did not present any evidence in support of her claim, she failed to carry her burden and "[o]ur conclusion in this regard encompasses both McKinney's burden on her own motion for summary judgment as well

as her responsive burden in connection with Cadleway's cross-motion for summary judgment");

*see also Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 603 (7th Cir. 1989) (stating that, even if plaintiffs filed their own motion for summary judgment, that does "not relieve them of their burden as the nonmovants relative to the defendant's motion for summary judgment").

**B.      Racial and Gender Discrimination**

The Plaintiff claims that the Defendant mistreated her at work and fired her because she is African American and a woman. In her words, "Plaintiff was terminated because she was African American and did not fit in with all the white office staff; because management didn't care to value differences respectfully." (Pl. Resp. 26.) If the Plaintiff's claim is true, that would violate Title VII:

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race and sex in employment:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race . . . [or] sex . . . .

42 U.S.C. § 2000e-2(a). A plaintiff may prove her discrimination case under the direct method or indirect method of proof. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The Plaintiff in this case does not indicate which method she is using so the Court will analyze her claims under both methods.

**1.      *Direct Method***

Two types of evidence are permissible under the direct method: (1) evidence that would

prove the fact in question without reliance on inference or presumption (direct evidence), and; (2)

evidence that allows a fact finder to infer intentional discrimination by the decision maker

(circumstantial evidence). *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003).

The Seventh Circuit has recognized three categories of circumstantial evidence under the direct

approach:

> The first category consists of suspicious timing, ambiguous statements oral or
> written, behavior toward or comments directed at other employees in the protected
> group, and other bits and pieces from which an inference of discriminatory intent
> might be drawn. The second type requires a showing that the employer
> systematically treated other, similarly situated, non-[Black and -female] employees
> better. The third type is evidence that the plaintiff was qualified for the position in
> question but passed over in favor of a person not having the forbidden
> characteristic and that the employer's stated reason for its decision is unworthy of
> belief, a mere pretext for discrimination. The latter category is substantially the
> same as the evidence required under the indirect method.

*Id.* at 601 (citations and internal quotations omitted).

The Plaintiff claims that she "was involuntarily terminated with malice . . . because she

was an African American female[] within an all white culture that refused to welcome Plaintiff to

simply perform her responsibilities in the workplace." (Pl. Mot. for Sum. J. 25.) The Plaintiff has

not pointed to any evidence that would prove the alleged discrimination without reliance on

inference or presumption, such as "an admission by the decision-maker that his actions were

based upon the prohibited animus." *Rhodes v. Illinois. Dept. of Transp.*, 359 F.3d 498, 504 (7th

Cir. 2004).

The incidents discussed for the hostile work environment claim could be under the first

category of circumstantial evidence in support of her race and gender discrimination claim.

However, the evidence does not show that those incidents (except for the "coffee, tea, or me"

remark) were based on race or gender, as the Court has already concluded, because the Plaintiff

50

failed to come forward with evidence linking the incidents and her race or gender and because the Defendant came forward with evidence showing that her race and gender were not the bases for any of the incidents. The one stray Hollman remark is by definition (because it is a singular incident) insufficient for evidence based on "ambiguous *statements* oral or written, behavior toward or *comments* directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Venturelli*, 350 F.3d at 601 (emphasis added).

The Plaintiff has failed to show with evidence that her employer systematically treated other, similarly situated, non-Black and male employees better. She has not made any statistical claims about being treated differently; instead, she has relied on several anecdotal situations. She claims that she was denied training and access to computer systems, implying that white employees did have such training and computer access. (Pl. Mot. 9 ("None of Wilson's counterparts . . . were denied access to Captura."); Pl. Resp. 26.) She also claims that two white male employees were not disciplined for misconduct that warranted termination. (Pl. Resp. 31–32.) The Plaintiff also testified that she viewed the instructions to clean Bob's Closet as racial harassment because other white employees were not given such menial, dirty tasks. (Wilson Dep. 56:8–10, DE 147-6 at 2; Pl. Mot. 6; Pl. Resp. 3.)

The Plaintiff only makes bare assertions about white administrative assistants who had access to computer systems that she could not access and about training that she did not experience, but she has provided no admissible evidence, such as corporate records showing computer access or training classes, or affidavits from employees about their access and training. Also, as discussed earlier in the context of the Plaintiff's hostile work environment claim, *see* Part

A.3, *supra*, the Defendant produced admissible evidence showing that the Defendant denied the Plaintiff access to computer systems because she repeatedly made mistakes with paper reimbursement forms, warranting the decision to not let her use the computer reimbursement system, and with the computer-based purchasing system. Also, even assuming the Plaintiff had evidence showing this different treatment, it would not show systematically different treatment because even by the Plaintiff's own admission, (Pl. Mot. 9), the white employees[10] were at different Kautex facilities and/or held different positions and/or did not share a common supervisor with the Plaintiff. *See Hensworth v Quotesmith.Com, Inc.*, 476 F.3d 487, 491–92 (7th Cir. 2007).

The Plaintiff claims that a white male employee, Kyle Morgan, should have been fired after he (allegedly) verbally and physically assaulted another employee, and that a maintenance worker, James Barton, was promoted rather than fired after he misappropriated company funds by taking unauthorized trips with coworkers to Mexico. In support of these claims, she cites to "Exhibit 19-2 pages," (Pl. Resp. 31–32), but it is not clear to what this citation is referring. The Plaintiff's two large attachments accompanying her Response are a jumble of "exhibits" organized by number, letter, and roman numeral in no particular order. This citation does not comply with the local rule regarding summary judgment and is not sufficient to provide evidence for her claim about the two other white employees. N.D. Ind. L.R. 56.1; *Cambridge Indus., Inc.*, 325 F.3d at 898. Nevertheless, the Court reviewed the two attachments to the Plaintiff's Response and did not locate any evidence establishing that these two employees committed the alleged

---

[10] The Plaintiff stated that these "counterparts" worked in Michigan and Ontario. The other counterpart is Sherry Martz, whom the Plaintiff described as "HR Assistant." (Pl. Mot. 9.) Martz is the "Human Resources Coordinator at Kautex," and her "job duties include coordinating Kautex's human resources and benefit policies." (Hollman Aff. ¶ 13.) This job description is far different from that of the Plaintiff's.

misconduct. There are two emails from the Plaintiff to others at the company about trips to Mexico, but neither of them support the Plaintiff's claims. (*See* DE 149-3 at 6–9.)

Even if the Plaintiff's allegations about Morgan and Barton were supported by the evidence, her claims that the Defendant systematically treated white employees better than her would fail because those employees' positions were very different than the Plaintiff's position. "A plaintiff must show disparate treatment between comparable individuals." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). *See also Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1117 (7th Cir. 2009) (rejecting plaintiff's claim that non-whites were treated different in part because there was no explanation of how the lack of discipline for one non-white employee compared to the plaintiff's situation); *Hensworth*, 476 F.3d at 492 (stating that "[s]tatistical evidence is only helpful when the plaintiff faithfully compares one apple to another without being clouded with thoughts of Apple Pie ala Mode or Apple iPods," and that the plaintiff's evidence "lacks the necessary context needed for meaningful comparison and therefore must be rejected"). Morgan's and Barton's jobs of managing production at the plant and supervising production and maintenance operations at the plant, (*see* Fatum Aff. ¶¶ 29–30), are far different than the Plaintiff's administrative assistant duties.

The Plaintiff has not referred to or produced any evidence that would support her claims that white assistants never performed tasks like cleaning closets and that she was given the assignment because of her race. To support such a claim, helpful evidence might include affidavits of current or former white administrative assistants who state that they were never ordered to perform such tasks. Also, as discussed earlier in the context of the Plaintiff's hostile work environment claim, the Defendant has come forward with evidence showing that cleaning

the closet was consistent with her job description. The Plaintiff has not produced any evidence

that her job description was different than that of white administrative assistants, or any other

evidence to suggest that the assignment as motivated by race. Furthermore, cleaning the closet is

not an adverse employment action, which is required for a disparate treatment claim. *See Nichols*

*v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (stating that a materially adverse

employment action "is something more disruptive than a mere inconvenience or an alteration of

job responsibilities")

Because the third category of circumstantial evidence under the direct method "is

substantially the same as the evidence required under the indirect method," *Venturelli*, 350 F.3d at

599, the Court will address that issue and evidence more thoroughly in the next section.


**2.       *Indirect Method***

The indirect method of showing race or sex discrimination is the burden-shifting regime

from *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973). The plaintiff must first establish

a prima facie case of race and/or gender discrimination by proving "(1) she is a member of a

protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse

employment action; and (4) similarly situated employees outside of her protected class were

treated more favorably." *Greene v. Potter*, 557 F.3d 765, 768 (7th Cir. 2009) (quoting *Goodwin v.*

*Bd. of Trustees of the Univ. of Ill.*, 442 F.3d 611, 617 (7th Cir. 2006)). If the plaintiff meets these

requirements, "the burden shift[s] to the employer to articulate some legitimate,

nondiscriminatory reason for the adverse employment action." *Id.* (internal quotations omitted). If

the defendant can make this showing, the plaintiff "must prove that the stated reason is merely

pretext for unlawful discrimination." *Id.* (internal quotations omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 768–79.

In this case, only the second and fourth steps of the prima facie case are at issue. The Plaintiff is clearly a member of a protected class: she is a female and an African American. Her termination qualifies as a materially adverse employment action. The Defendant argues that the Plaintiff did not perform her job satisfactorily and was not meeting legitimate job expectations, and that similarly situated employees were not treated more favorably than the Plaintiff. The Plaintiff argues that she did meet the Defendant's job expectations and performed her work satisfactorily, and that she was treated differently than other employees in terms of training, being accepted into the workplace culture, and discipline for misconduct.

Because one of the Plaintiff's argument is that her termination is inconsistent with how the Defendant handled other employees' misconduct, she is claiming that "an employer's legitimate expectations were disparately applied." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). As a result, "the second and fourth elements of the prima facie case are closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together." *Id.* Therefore, the Court will first examine whether the Plaintiff met the Defendant's legitimate job expectations in terms of work performance (including workplace behavior) and then whether the Plaintiff was treated differently than similarly situated employees. This analysis will include consideration of whether the adverse employment action was pretextual in light of her arguments about other employees.

*(a) The Plaintiff's Job Performance and Whether She Met Legitimate Job Expectations*

The Defendant's evidence establishes that the Plaintiff began having job performance problems relatively soon after she was hired. These problems increased in number and severity as time went on, and the Plaintiff related poorly to her supervisors and coworkers. Finally, several incidents involving disputes with coworkers and insubordination in November and December led to the decision to terminate the Plaintiff's employment.

The affidavits of Fatum, Fuller, and Hollman, along with the attached email exhibits, establish that the Plaintiff had trouble meeting job performance expectations related to the two computer systems she should use for her job and ordering supplies. The Plaintiff "had made several mistakes in the manual expense reporting system and . . . she demonstrated a lack of skill and ability in managing Kautex'[s] automated purchased and procurement system, Ariba." (Hollman Aff. ¶ 5, DE 147-5 at 2.) "Wilson failed to use Ariba properly. . . . I arranged for Wilson to receive additional training with Ariba and tried to help her understand the system and use it effectively, however, Wilson never mastered the system and frequently failed to submit supply orders correctly." (*Id.* ¶ 7.) As a consequence, her computer-related problems resulted in "supply shortages at the plant." (*Id.* ¶ 8.) Fuller and Fatum concurred with Hollman's view: "Because Wilson continually failed to enter the required information to complete Ariba orders, there were several instances when the plant did not have the necessary supplies to operate." (Fuller Aff. ¶ 6, DE 147-3 at 2.) (*See also* Fatum Aff. ¶¶ 9, 11.)

The Defendant also provided evidence that the Plaintiff had trouble relating with her coworkers and supervisors. For example, she wrote an email to Hollman that was considered

56

inappropriate and bordered on insubordination: "Since you are enjoying every order that I place. It is clear that you intend on making my job as difficult as possible. I DO NOT learn by you taking pleasure in making my job difficult." (Hollman Aff., Ex. C, June 27, 2005, Wilson-Hollman email, DE 147-3 at 17.) The Plaintiff also "refused to carry out assignment[s] [that] I delegated to her," according to Fatum. (Fatum Aff. ¶ 12.) Fatum stated that the Plaintiff "sent e-mails addressed or copied to me that were unnecessarily confrontational." (*Id.* at ¶ 10.) In addition, several employees complained to Fatum about "Wilson's demeanor and communication style. I received several complaints that Wilson was rude, disrespectful, and uncooperative." (Fatum Aff. ¶ 10.) "Employees also complained that Wilson sent caustic e-mail messages. On more than one occasion, Wilson sent e-mails addressed or copied to me that were unnecessarily confrontational." (*Id.*) Fuller reported the same problem. "Wilson did not get along with the other employees at the Avilla, Indiana plant. I received several complaints from other staff members that Wilson was rude, disrespectful, and sent attack style e-mail messages." (Fuller Aff. ¶ 8.) Fuller stated that he tried to address this issue by telling the Plaintiff "that she needed to be less abrasive and be more respectful of other people." (*Id.* at ¶ 10.)

On several occasions, the Plaintiff took unauthorized action and disobeyed her supervisors' instructions. In August, Fatum learned that the Plaintiff had without authorization given awards (in the form of certificates for a hotel room) to contract cleaning workers and to a temporary contract employee. This issue arose again in early December when Fatum and Fuller learned that the Plaintiff had also given away movie tickets "from the Spirit Team's supply of recognition awards." (Fuller Aff. ¶ 17.) The recipient, John Swihart, told Fatum that "Wilson approached Swihart and gave him an envelope containing movie passes. Swihart reported that

when Wilson gave him the envelope, she put her finger to her lips and said, 'Shh, don't tell anyone.'" (*Id.*) In November, the Plaintiff asked Fuller about buying a DVD player, and Fuller told her not to buy it. (*Id.* at ¶ 15.) However, on November 26, the Plaintiff delivered to the plant a DVD player that she had purchased. (*Id.* at ¶ 19.) Fuller also learned in early December that the Plaintiff had worked unauthorized overtime in late November. (*Id.* at ¶ 21.)

Supervisors met and communicated with the Plaintiff several times about her problems. Fuller met with her in June and August "about her conduct and told her that she needed to be less abrasive and more respectful of other people." (Fuller Aff. ¶ 10.) In August, Fuller and Fatum met with the Plaintiff about the unauthorized award. (Fatum Aff. ¶ 15.)

In November and early December, additional incidents occurred that played a role in the Defendant's decision to terminate the Plaintiff's employment. The first incident was when "Wilson confront[ed] Sheryl Ritchie . . . about the employee Christmas party." (Fuller ¶ 16.) Fatum believed that the Plaintiff's "conduct was inappropriate" in a conversation with Ritchie about the party in Fatum's office. (Fatum ¶ 19.) Fatum and Fuller met with the Plaintiff on November 29 after the Christmas party incident about that and other problems. "Fatum and I informed Wilson that her conduct and job performance [were] unacceptable." (Fuller Aff. ¶ 16.) Both Fatum and Fuller stated in their affidavits that they talked to the Plaintiff about her "(I) inflammatory emails to other employees, (ii) poor attitude[,] (iii) poor treatment of other employees, (iv) demonstrated lack of respect of other employees, and (v) supply ordering problems." (Fuller Aff. ¶ 16; Fatum Aff. ¶ 21.) Fuller "reminded Wilson that the meeting was the third time that I had talked to her about her conduct. I told Wilson that her behavior had to stop because it was negatively affecting morale. I told Wilson that her conduct and performance had to

improve or we would ask her to leave Kautex." (Fuller Aff. ¶ 16.)

The second situation involved the Plaintiff's response to two requests to use a conference room. Fuller attested that the Plaintiff's emails to Keytoria King were rude and accusatory and that the Plaintiff had mistreated King, adding that he disagreed with the Plaintiff that King had been unprofessional. Fatum also attested that the Plaintiff had refused Ritchie's request for a specific conference room for a Team Spirit meeting. The third incident was the Plaintiff's actions preventing an hourly employee from getting a free cup of coffee from the front office even thought "it was standard practice at the . . . plant that hourly employees were permitted to get coffee from the office, at no charge." (Fuller Aff. ¶ 18.) The other incidents were giving the movie passes to Swihart and working unauthorized overtime.

These incidents, coupled with the other problems, led to the December 5 meeting with Fuller, Fatum, and the Plaintiff. The Plaintiff admitted that she had worked overtime without authorization and that she knew that she was not supposed to do so. She also admitted buying the DVD player even though she had been told not to buy it. The Plaintiff denied giving unauthorized awards at first, but then she admitted doing so when Fuller asked about Swihart. Fuller concluded that "I felt I could not trust her and her employment was terminated." (Fuller Aff. ¶ 21.) He discussed the matter more with Fatum and they both agreed to terminated the Plaintiff for four reasons: (1) she issued awards without authorization; (2) she bought a DVD player after being told not to; (3) she worked unauthorized overtime; and (4) her disrespectful demeanor negatively affected morale. Fuller attested that their "decision to terminate Wilson's employment had nothing to do with her race or gender." (Fuller Aff. ¶ 22.)

The Plaintiff argues that she did have authorization to work overtime, that she only

purchased items when told to do so, that she was told her job performance was good, and that her inability to get along with others was not her fault but the result of other persons ostracizing her and the company's culture. She also argues that the fact that her receipt of one or more bonuses belies the Defendant's claim that she was not meeting her job performance expectations.

(i) The Issue of Authorized or Unauthorized Overtime

The Plaintiff argues that Fuller always signed her overtime invoices and never communicated to her that she was violating policy. Her citation to evidence in support of this argument is as follows: "A copy of Overtime authorization hours from April 29-to November 17, 2005 a total of fourteen (14) signed documents by Fuller as Exhibit '11' already submitted to the U.S. District Court on July 30, 2007 in Plaintiff Response to Defendant(s) Interrogatories)." (Pl. Mot. 18.) She makes the same point in her Response. (Pl. Resp. 4, 15–16.)

There are several problems with this. First, as discussed above, the Plaintiff has failed to correctly designate evidence in support of her claim about overtime. Referring to a document that purportedly was filed almost two years ago does not comply with the local rule for summary judgment, N.D. L.R. 56.1, and the Court "cannot be expected to search through the entire record for evidence that may support a party's contentions." *Compania*, 533 F.3d at 562.

Second, even if the Court were to consider "Exhibit 11," it does not support her claim or contradict the Defendant's claim. The Court located an "Exhibit 11" within the Plaintiff's first attachment to her Response. Within this 57-page document, there are several pages of what appear to be Kautex overtime approval forms. (*See* Pl. Resp. Att. 1 at 9–22, DE 149-2.) The problem is that the last timesheet was signed by the Plaintiff on November 15 and by a supervisor

(the signature is illegible) on November 17 for overtime worked on November 8 and November 9. But the Plaintiff was reprimanded (and eventually fired) for unauthorized overtime during the weekend of November 26 and 27. (*See* Fuller Aff. ¶ 19 ("On December 2, I learned Wilson had worked unauthorized overtime the *previous weekend*.") (emphasis added)). The Plaintiff's improperly designated "evidence" does not support her denial of the Defendant's sworn testimony that she worked unauthorized overtime.

### (ii) The Issue of Authorized or Unauthorized Purchases

The Plaintiff denies that she bought items or issued awards without authorization. She states that she questioned Fatum and Fuller (rather than the other way around, as the Defendant claims) about giving awards to contract employees because it was against company policy, but Fatum told the Plaintiff just to do what she was told if she wanted to keep her job. (*Id.* at 19.) In support of her claim, the Plaintiff quotes from two purported emails from Fatum and cites to filings that occurred on July 30, 2007. (Pl. Mot. 18–19.)  The Plaintiff has not properly designated such evidence for the Court's consideration. *Waldridge*, 24 F.3d at 922..

However, even if the Court were to consider the content of the emails, it would not support the Plaintiff's claims. Fatum and Fuller stated that they agreed to terminate the Plaintiff's employment on December 5 in part because of the unauthorized DVD player purchase and the unauthorized award (in the form of movie tickets) to Swihart. The Plaintiff's two purported emails do not address these incidents or indicate that the Plaintiff had authorization. The first email refers to award plaques and is from May 2005. The second is from November 28, mentions movie tickets, and references to Ernie Loehr and Greg (last name not given), not John Swihart.

Also, neither of the emails authorized the purchase of a DVD player. As to the Plaintiff's claim that "[a]ll business items that Plaintiff purchases were with either Fuller's or Fatum's authorization," (Pl. Mot. 19), a simple denial of the Defendant's evidence-supported arguments does not suffice at the summary judgment stage. Fed. R. Civ. P. 56(e)(2).

### (iii) The Plaintiff's Performance Review and Bonus

The Plaintiff states that she received a positive performance reviews, performance-related emails from Fatum at the end of November, and a bonus, and that this shows she was meeting expectations. Her citations refer to filings made in July and November of 2007, (Pl. Mot. 19–20), so the Plaintiff has not properly designated such evidence, and the Court does not have to consider it. *Compania*, 533 F3d. at 562 ("The district court cannot be expected to search through the entire record for evidence that may support a party's contentions."). However, if the Court did consider this evidence, it would not establish that she was meeting performance expectations or that the Defendant's reasons were pretextual.

The Court located the Textron PMP performance review in one of the Plaintiff's attachments to her Response. (*See* DE 149-2 at 45–55.) In this document, Fuller gives generally positive comments about the Plaintiff's performance, but there is no overall grade or rating or date of review. The document does not indicate that the Plaintiff received the bonus she claims to have received. The attachment also includes a November 28 email from Fatum to the Plaintiff stating that "you're still performing your work for Kautex as expected. I've gotten positive reports from the people . . . ." (Nov. 28, 2005, Fatum-Wilson email, Pl. Resp. Ex. 1 at 56, DE 149-2.) This improperly designated evidence does not raise a genuine issue of material fact about

whether the Plaintiff was meeting legitimate job expectations or why the Defendant terminated her employment. Fuller and Fatum listed four reasons—issuing unauthorized awards, unauthorized purchases, violating company rules (in the form of working unauthorized overtime), and her demeanor and its affect on the morale of others—for firing the Plaintiff in their conversations with the Plaintiff and in Fatum's letter to the Plaintiff, and failing to get good ratings on the PMP was not one of them. Hence, the Plaintiff's positive performance review and bonus (if she did indeed get such a bonus) are immaterial to the reasons for the termination. Similarly, in *Moser v. Ind. Dept. of Corrections*, 406 F.3d 895 (7th Cir. 2005), the court found that the plaintiff did not meet her employer's legitimate job expectations despite her "laudable twenty-year performance record" because of recent misconduct. *Id.* at 901. Furthermore, while the Plaintiff's demeanor and effect on others had been an issue for several months, most of the specific reasons (unauthorized awards, purchases, and overtime) cited for the termination occurred after the performance review and in the week prior to the termination. "[T]he critical inquiry is her performance at the time of her termination." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 753 (7th Cir. 2006) (emphasis, internal quotations, and brackets omitted). "[A]lthough prior evaluations can be relevant in some circumstances, they cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Id.* (internal quotations omitted). *See also Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) ("The fact that Fane completed her assignments has no bearing on whether she met Locke Reynolds's expectations regarding employee conduct.").

<u>(iv) The Plaintiff's Relationships with and Demeanor Toward Others</u>

The Plaintiff argues that her problems in getting along with others was the fault of her supervisors and employees at Kautex. She contends that Fatum's instructions to clean Bob's Closet on her third day of work "destroyed any prospects of Plaintiff having a successful career with Kautex" by demeaning the Plaintiff and letting others know that she was not valued. (Pl. Mot. 19, 24.) She states that others "felt likewise in their harassment to Wilson in order to win favor with management." (*Id.* at 24) She also stated that she "tried diligently to fit into the culture already existing at the company but was not welcome by the interoffice team." (*Id.* at 19.)

The Plaintiff has not designated any evidence in support of this argument. The Court has already found in the hostile work environment analysis that the Plaintiff has no evidence to support the claim that being told to clean Bob's Closet was discriminatory. There is no evidence—such as deposition or affidavit testimony from other current or former employees —before the Court that the Defendant made an effort to mistreat the Plaintiff or make her feel unwelcome. Not fitting into the clique hardly arises to the intentional discrimination that is prohibited by Title VII, which "is not a code of civility." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007).

*(b) Whether Similarly Situated Employees Were Treated More Favorably Than the Plaintiff*

The Plaintiff states that white employees at Kautex were treated better than she was in terms of work discipline, duties, and training. The Plaintiff supports her allegation about disparate application of discipline with claims about two white male employees, Barton and Morgan. Lacking admissible evidence to support these allegations, she states that they misappropriated

thousands of dollars of company funds, took business trips to Mexico for personal reasons, abused drugs and alcohol, and/or verbally and physically abused another employee. (Pl. Resp. 26–27; Pl. Reply 3.) The Plaintiff states that Barton was promoted, and that Morgan was disciplined for one month and then promoted.

The Court already addressed this argument, *see* Part B.1, supra. The Plaintiff's argument lacks any admissible evidence about these purported incidents involving these employees and what, if any, discipline they received. The Plaintiff has not shown that these employees are "directly comparable in all material respects," *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004), and the Defendant has shown that they are not. To make the comparison, courts look at "all relevant factors" including "whether the employees (I) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision." *Brummet v. Sinclair Broadcasting Group, Inc.*, 414 F.3d 686, 692–93 (7th Cir. 2005).

The Plaintiff was an administrative assistant. Barton and Morgan held very different jobs. Morgan was "a Focus Factor Manager. Morgan's job involved managing production" at the plant. (Fatum Aff. ¶ 29.) Barton was "an Operations Manager. Barton's job involved supervising the production and maintenance operations at" the plant. (*Id.* ¶ 30.) They clearly did not have the same job description, and it is seems unlikely (in light of their different job descriptions) that they were subject to the same supervisor. As a result, they are not directly comparable in all material respects to the Plaintiff, so her argument about disparate discipline fails.

The Plaintiff claims that "[n]o White employee performed administrative duties . . . who

also supported Fuller ever cleaned Bob's Closet," (Pl. Resp. 5), and that her "counterparts" at other Kautex facilities in Detroit, Ontario, and Georgia had access to the online payment system, Captura, while she did not. (Pl. Mot. 9.) However, the Plaintiff has provided no evidence, admissible or not, to support these claims. For example, no affidavit from a knowledgeable employee (or even a former employee) provides testimony about whether Bob's Closet was ever cleaned. Also, no affidavit testimony from the Plaintiff's counterparts or other knowledgeable employees addresses their access to Captura. In addition, the Defendant has shown that cleaning Bob's Closet fit the Plaintiff's job description, and the Plaintiff has not shown this is a pretext applied only to her because she is black. To do this, she needs "proof that the defendant's explanation is unworthy of credence," and that the explanation is "a lie rather than an oddity or error." *Faas*, 532 F.3d at 642 (internal quotations and brackets omitted). Also, the counterparts in other Kautex offices obviously do not share the same supervisor, and the Plaintiff has not come forward with evidence that they have the same job description or comparable experience, education, and other qualifications as the Plaintiff.

In conclusion, the Plaintiff has failed to establish through either the direct or indirect method that she suffered gender or race discrimination. In addition, the Defendant has established with evidence that it terminated the Plaintiff for legitimate, non-discriminatory reasons relating to workplace needs and not for any prohibited pretextual reason.

## C.    Retaliation

The Plaintiff also claims that the Defendant retaliated against her for complaining about discrimination. The Plaintiff states that in May 2005 she complained to Sarah Broschay (the

Plaintiff refers to her as "Boarsi"), a human resources official, about her alleged treatment at the hands of Fuller, Fatum, and Hollman. The Plaintiff argues that the Defendant retaliated against her for this complaint by not letting her attend weekly meetings. (Pl. Mot. 11; Pl. Resp. 7.)

Title VII makes it unlawful to discriminate against any employee who opposes a practice made unlawful by Title VII or because he made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). In retaliation cases, the direct evidence approach requires a plaintiff to present evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). The indirect method requires that the "plaintiff must prove that (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008).

The first problem under both methods of proof with the Plaintiff's claim is that she has not come forward with any evidence to support the contention that she engaged in statutorily protected activity—reporting racial and/or gender discrimination. Her citation to show that she complained to Broschay refers to a copy of her business travel itinerary, and she calls this document "Exhibit U of July 30/07 Plaintiff Response to Defendant(s) Interrogatories." (Pl. Mot. 10.) This citation does not comply with the local rule for summary judgment proceedings, and the Court is not required to scour the record looking for evidence to support the Plaintiff's claim. Also, a travel itinerary would only show that the Plaintiff traveled somewhere; it would not

establish that she actually complained to Broschay. The Plaintiff's filings lack evidence—such as a sworn affidavit from the Plaintiff or Broschay stating that the Plaintiff complained to Broschay—to support the Plaintiff's claim that she complained to Broschay.

Another problem under the direct method is that the Plaintiff does not establish with admissible evidence a causal connection between her purported complaints about harassment and her termination. The supervisor must have been "aware of the allegations of discrimination at the time of [their] decisions to . . . terminate [the plaintiff's] employment; absent such knowledge, there can be no causal link between the two." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). It is not sufficient that the supervisors "*could* or even *should* have known" about the Plaintiff's complaints; they must "have had actual knowledge of the complaints" for the termination to be retaliatory. *Id.* (emphasis in original). Both Fatum and Fuller stated in their sworn affidavits that they were not aware of any conversation between the Plaintiff and Broschay, that Broschay never discussed the Plaintiff with them, and that the Plaintiff never told them that she had spoken with Broschay. (Fatum ¶ 30; Fuller ¶ 23.) Based on the evidence properly before the Court, there is no causal connection between any alleged complaints and the alleged retaliation.

The Plaintiff cannot satisfy the other requirements of the indirect method. As the Court has already found, the Plaintiff was not meeting her employer's legitimate expectations and she was not treated less favorably than similarly situated employees.

## D.     Miscellaneous Issues

The Plaintiff mentions several other issues or situations in her summary judgment filings.

She complains about not being able to access payroll and medical information about herself on the company's computer system. The Plaintiff provides no evidentiary support for this claim. Even if she did, that does not rise to the level of adverse employment action. Not being able to these computer records does not come close to the three types of Title VII adverse employment action. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009).

The Plaintiff also complains about a number of alleged issues or situations that arose after she was fired: an unspecified "conspiracy between Kautex and the Otis R. Bowen Center," (Pl. Mot. 2); the Defendant's alleged involvement in the State of Indiana's denying food stamps to the Plaintiff; the Defendant's alleged involvement with being rejected for a job at McDonald's; the conduct of the Defendant's attorneys throughout the case; the Defendant's alleged monitoring of her credit record; and the Defendant's alleged arranging for her to be improperly charged for cell phone use. She frames all of these as retaliation claims.

A plaintiff can state a claim for retaliation under Title VII for actions the defendant takes after employment ends if the actions "go beyond workplace-related or employment-related retaliatory acts and harm," such as "negative references in retaliation for engaging in protected activity." *Szymanski v. County of Cook*, 468 F.3d 1028, 1029 (7th Cir. 2006). But the Plaintiff must produce evidence that supports these claims, and she does not do so sufficiently.

The Plaintiff provides no details about the specifics of the alleged retaliation or the alleged conspiracy perpetrated by the Defendant and the Otis Bowen Center. Based on other filings in the case, the Plaintiff apparently worked at this center for a period of time, but the Court does not have to scour the record for evidence in support of the Plaintiff's claim. The Plaintiff also has not cited evidence to support her claim about the Defendant's alleged monitoring of her credit

records.

The Plaintiff also did not properly designate the evidence to support the claim that the Defendant falsely reported that the Plaintiff failed to report income to the State of Indiana, resulting in the Plaintiff not receiving food stamps. The Court located a document that appears to be from someone with works in the food stamps program and a letter from the Plaintiff to this person. These documents do not prove that the Defendant provided information to the state government about the Plaintiff's financial situation. The government document does not state that the Defendant or any of its employees provided the information; it just states "I have received information . . . ." (TANF Form, DE 149-3 at 53.) The Plaintiff's letter to the state food stamps official is not admissible evidence about what the Defendant may have done because the Plaintiff's letter's statements about the state official's comments are hearsay and the letter's statements about the Defendant's statements (as relayed by the state official) are double hearsay. Without admissible evidence of communication between the Defendant and the food stamp official (let alone evidence showing that the communication was false), the Plaintiff's claim fails. *See Matthews v. Wisc. Energy Corp. Inc.*, 534 F.3d 547, 559 (7th Cir. 2008) ("[T]here is no admissible evidence that Midwest ever talked with Wisconsin Energy regarding Matthews's employment. So this [post-employment retaliation] theory falls short as well."); *Szymanski*, 468 F.3d at 1031 ("Given that there is no admissible evidence to show that Dr. Raba ever talked to anyone at the University of Chicago, and given the statements Szymanski herself made, it is impossible to conclude that her failure to be hired had anything at all to do with retaliation on the part of Cook County.").

The Plaintiff's claim about not being hired at McDonald's due to the Defendant's action

has a similar problem. The Plaintiff does not designate evidence properly, but the Court located a letter, dated September 19, 2006, that purports to be from Judith Sydor, regional recruiter for McDonald's. (McDonald's Letter, DE 149-3 at 59.) The letter, which was not properly authenticated, states in part:

> It is within our human resource guidelines to conduct a full employment investigation on all candidates applying for work at McDonald's. After speaking with your former employer in Avilla, IN where you were employed in 2005. [*sic*] Unfortunately and with regret we are unable to continue the employment process for the Human Resource positions that are currently available. Please contact your former employer for resolution.

(*Id.*) This letter states that Sydor spoke with a representative of the Defendant, but it does not state what the person said. Without some information about the content of the conversation or some proof that what the Defendant allegedly relayed was false, the Court cannot infer that it was an "adverse" action, such as a false and negative statement about the Plaintiff. *See Matthews*, 534 F.3d at 559 ("[A] number of Matthews's purported acts of retaliation similarly fail because they were not 'adverse.' With respect to the statements made to FMS, Wisconsin Energy did not provide any false information."). For example, the Defendant could have told Sydor that the Defendant's employment was terminated for the four legitimate, non-discriminatory reasons that the Court discussed above. Such "objectively true" information cannot support a claim of retaliation. *Id.*

The Plaintiff accuses counsel for the Defendant of producing fabricated documents and slandering the Plaintiff. (Pl. Mot. 22–23.) These issues are the subject of the Plaintiff's Verified Motion for Sanctions [DE 132] and are beyond the scope of the EEOC charge or Complaint in this case. As such, she cannot bring these claims at this time. *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) ("As a general rule, a Title VII plaintiff cannot bring claims in a

lawsuit that were not included in her EEOC charge."). These claims are not "like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations," *Teal v. Potter*, 559 F.3d 687, 691–92 (7th Cir. 2009), which is a "liberal standard," because they could not "reasonably be expected to be discovered in the course of the EEOC's investigation." *Id.* at 692.

Last, the Plaintiff alleges that the Defendant retaliated against her by causing Verizon (and later a collection agency) to seek payment from her after her employment was terminated for a work cell phone that the Plaintiff had used while she was still employed. (Pl. Mot. 8; Pl. Resp. 8.) To support this claim, she cites to exhibits "X" and "8," which she says were filed in July 2007. Citations to previously filed documents are not acceptable, N.D. L.R. 56.1, and the Court does not have to scour the record to locate these documents.

## CONCLUSION

For the foregoing reasons, the Defendant is entitled to summary judgment on the Plaintiffs' claims of hostile work environment, racial and gender discrimination, and retaliation. Because the Plaintiff has failed to produce evidence that raises a genuine issue of material fact regarding her claims in response to the Defendant's Motion for Summary Judgment, the Plaintiff has also fallen far short of the hurdle she faces with her own Motion for Summary Judgment, as to which she must show entitlement to judgment as a matter of law.

Therefore, the Defendant's Motion for Summary Judgment [DE 145] is GRANTED, and the Plaintiff's Motion for Summary Judgment [DE 143] is DENIED. Final Judgment shall be entered accordingly.

SO ORDERED on June 10, 2009.

         s/ Theresa L. Springmann

THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT